SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,

v.

WASHINGTON COUNTY UTILITY DISTRICT, et al., Defendants,

Wade H. Patrick, Defendant-Appellee.

No. 80–1261.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 21, 1981.

Decided April 23, 1982.

Joseph L. Grant, Securities and Exchange Commission, Atlanta, Ga., John H. Cary, U. S. Atty., Knoxville, Tenn., Larry R. LaVoie, Washington, D. C., Guy W. Blackwell, Asst. U. S. Atty., Greeneville, Tenn., Elisse B. Walter, Asst. Gen. Counsel, Jacob H. Stillman, Associate Gen. Counsel, Ralph C. Ferrara, Gen. Counsel, Washington, D. C., for plaintiff-appellant.

Walter L. Price, Johnson City, Tenn., for defendant-appellee.

Before EDWARDS, Chief Circuit Judge, KENNEDY, Circuit Judge, and CELEBREZZE, Senior Circuit Judge.

CELEBREZZE, Senior Circuit Judge.

The Securities and Exchange Commission (Commission), plaintiff-appellant, brought this action pursuant to Sec. 20(b) of the Securities Act, 15 U.S.C. Sec. 77t(b), and Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. Sections 78u(d) and 78u(e). In its complaint the Commission requested that the defendants [1] be enjoined from violating the securities laws in the future. The Commission also petitioned the United States District Court for the Eastern District of Tennessee to order the defendants to disgorge any income or property which they received as a result of their unlawful conduct. A hearing was held by the district court on the Commission's request for a permanent injunction and disgorgement with respect to defendant-appellee Wade Patrick. The district court denied the Commission's request. From this order the Commission appeals. We find that the district court, when it decided whether equitable relief was appropriate, failed to recognize at least one violation of the securities laws committed by Mr. Patrick, and therefore we reverse.

Patrick, was the manager of the Washington County Utility District from 1956 until after this action was filed in 1977. The District is a public utility district organized pursuant to Tenn.Code Ann.Sec. 7–82–101 et seq. It was originally created to provide garbage service for the residents of the unincorporated areas of Washington County, Tennessee. Subsequently, the District expanded its functions, and in 1977 it had four separate operating divisions: the Garbage Division, the Community Antenna Television (CATV) Division, the Transit Division, and the Sewer Division. Pursuant to the authorizing statute, the District was governed by a board of three commissioners. The Board of Commissioners had the power to determine policy and to enter contracts on behalf of the District. Furthermore, the Commissioners had the power to issue revenue bonds, on behalf of the District, upon passage of an appropriate authorizing resolution. Between 1965 and 1975 the District issued and sold revenue bonds worth $3,675,000 in seven public offerings. The resolutions authorizing each of the issues required the District to use the proceeds from the sale of the bonds for the purposes specified in the resolutions, and to redeem the bonds solely with revenues from the issuing division.

1. The Washington County Utility District, the Commissioners of the District, the underwriter Mr. Alcock, and the District's bond counsel were also named as defendants. Prior to the hearing on the permanent injunction, all of these parties entered into consent decrees. None of them are parties to this appeal.

Patrick was responsible for arranging the sale of the District's bonds. To that end, he selected Mr. Thomas Alcock to underwrite each of the District's bond issues. Alcock received two forms of compensation on each issue: a "spread", the difference between the price at which he purchased the bonds and the price at which he sold them, and a fiscal agent fee, which usually amounted to 5% of the total face amount of the issue. When Alcock and Patrick agreed to the terms of a particular offering, Patrick would present the terms and an authorizing resolution to the Board of Commissioners. Typically, both were summarily approved by the Board.[2]

In early 1970, state regulations required the District to find a new landfill site. While the district was searching for a replacement site, Patrick acquired, for $3,000, an option to purchase a 300 acre parcel of land known as the Milhorn property for $70,000. After acquiring the option, Patrick obtained from the State of Tennessee tentative approval to use the Milhorn property as a landfill site, and proposed to sell the property to the District for $228,000. The proceeds from this sale were to be equally divided between Patrick and Alcock, who were "partners" in this venture. The District proposed to pay for the Milhorn property by selling bonds which were to be redeemed solely from the proceeds from new Anti-Pollution Division that Patrick and Alcock proposed to create.[3] The Commissioners passed a resolution which authorized an issue of bonds with a face value of $650,000. According to the offering circular prepared by Alcock, $297,000 was to be used to purchase the Milhorn property. Neither the bond resolution nor the offering circular disclosed the option or indicated that $228,000 was to be paid to the District's manager and underwriter. Subsequent to the issuing of the bonds, the Commissioners passed a resolution authorizing the District to purchase the Milhorn option for $228,000, payable in bonds from the offering. Alcock and Patrick, apparently, never received the full amount authorized by the resolution. Patrick received at least $70,000.00 for his option, and $40,000 of that amount was paid with bonds issued by the District. The District eventually abandoned the plan to use the Milhorn property when the State of Tennessee refused to grant final approval for the use of the property as a landfill site.

As was previously indicated, the proceeds of the sales could only be used in the manner specified in the authorizing resolution. In several instances, however, the proceeds of issues were misappropriated. In 1972, the Garbage Division issued $500,000 in revenue bonds. The authorizing resolution indicated that the proceeds from that issue would be used to make "extensions and improvements" to the garbage disposal system. No improvements or extensions to the system were made with the $342,000 in net proceeds obtained from the sale of the bonds. Instead, $90,000 of the proceeds were used to make interest payments due on prior issues and approximately $180,000 of the proceeds were used to make loans to Patrick, his associates and his relatives.[4] The disposition of the proceeds of the 1972 Garbage Division offering was not disclosed to Alcock, nor was it disclosed to the investors and dealers that purchased the bonds. In September of 1973, the CATV Division offered a $400,000 bond issue, for the pur-

2. Alcock testified that he believed that the district was controlled by Patrick, and the Commissioners indicated that they usually followed his recommendations. The Commissioners indicated in their testimony that they typically approved the resolutions after a short presentation by Patrick. Alcock testified that he doubted that the Commissioners completely understood the resolutions.

3. This division did not exist at that time nor was it ever created. The Commission argues

that it was a sham allowing the district to offer the bonds as first lien bonds.

4. In September, 1972, the District made a $125,000, unsecured, 18 month loan to D & P Development Company, a partnership in which Patrick was a partner. A month later, Patrick caused the District to make a similar 12 month loan of $45,000 to Bullington Enterprises, a business entity owned by Patrick's son and his son-in-law. The District also made an $11,500 loan to Patrick.

pose of extending and improving the CATV system. Because of the District's insolvency,[5] Alcock and Patrick concluded, prior to the offering, that it would be necessary to divert some of the proceeds in order to satisfy current obligations. Approximately $90,500 of the proceeds were used to pay the interest due on outstanding bonds and $6,500 of the proceeds were transferred to other divisions. Approximately $157,000, less than one-half of the face value of the issue, was used for purposes stated in the authorizing resolution. The District did not disclose its insolvency and the diversion of the proceeds to the purchasers of that issue.

During the time that Alcock was serving as the underwriter for the District he received, as part of his compensation, a fiscal agent fee. Such a fee was charged for each bond issue handled by Alcock. One-half of the fiscal agent fee, after expenses, was given to Patrick. These payments were referred to as "finders fees" by Patrick and Alcock, although neither could identify any service performed by Patrick. The receipt of these fees by Patrick was not disclosed to the District's Commission, nor was the District's accountant aware of the arrangement. Significantly, Patrick arranged for these payments to be made to a corporation which he owned. The bond resolutions and the offering circulars did not indicate that the payments were being made to Patrick. In short, these payments were kept completely secret.[6]

The Commission filed a complaint on February 1, 1977, alleging that Patrick, Alcock, the District, its bond counsel, and the Commissioners had violated the federal securities laws in connection with the seven bond offerings. The district court entered a final judgment denying an injunction and disgorgement. In a memorandum opinion, the district court stated that, although the District had committed "flagrant violations" of the antifraud provisions of the securities laws, "the salient issue ... is whether any violation on the part of the defendant Mr. Patrick, personally, was shown." The district court, apparently[7] relying on *Securities and Exchange Commission v. Coffey*, 493 F.2d 1304 (6th Cir. 1974), *cert. denied*, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975), concluded that Patrick was personally liable for violations of the antifraud provisions of the securities laws only to the extent that he dealt directly with dealers or investors who purchased the District's bonds. The district court found that Patrick had violated the securities laws in a single instance when he misrepresented, in a conversation with a broker-dealer, the financial condition of the District.[8] The district court refused to grant injunctive relief, because the Commission had made no showing of a reasonable likelihood of future violations, and refused to compel disgorgement because the Commission had failed to prove the amount of profit received from the single violation found by the district court.

Apparently, the district court concluded that *Coffey* permitted a finding of personal responsibility for a violation of the antifraud provisions of the securities laws only when the defendant had directly dealt with

5. By June 30, 1973, the District's liabilities exceeded its assets by approximately $230,000. In subsequent years, the District continued to lose money and its financial condition worsened. In 1974, the District's liabilities exceeded its assets by over $337,000. In 1975 by over $500,000, in 1976 by over $656,000, and in 1977 by over $813,000.

6. The Commission argues that the high offering expenses were a *quid pro quo* for the payments. Expert testimony indicated that the offering costs were "exorbitant", and that these high offering costs raised a question as to whether the issues were financially feasible.

7. The district court did not explain why it chose to use the directly dealing analysis in reaching this decision. It is clear from its citation of *Coffey*, however, that it felt that such analysis was required.

8. Specifically, Patrick indicated that the "district was operating profitably and everything is all right." At the time this remark was made, the district was insolvent. On appeal, Patrick does not challenge the district court's conclusion that this conduct amounted to a violation of the securities laws. Accordingly, we do not address that part of the district court's order.

a broker or investor. The district court, therefore, failed to consider whether Patrick could be held primarily or secondarily liable because of the diversion or misappropriation of proceeds, the undisclosed conflict of interest with regard to the Milhorn transaction, or the undisclosed payments received from Alcock. We believe that the district court read *Coffey* too narrowly. Patrick's conduct in each of those situations should have been analyzed to determine whether he was primarily or secondarily liable for the alleged violations. Because the district court failed to apply *Coffey* properly, we vacate its order denying a permanent injunction and disgorgement.

█ In *Coffey*, the trial court had enjoined John King, Chairman of the Board of a corporation which had allegedly failed to disclose material information, from violating the securities laws in the future. The basis for this injunction was that King was responsible for the failure of the corporation to disclose material information. King had no contact with any of the parties who were misled by the corporation's non-disclosure, nor was he aware of the nature of the information which was not disclosed. *Coffey*, 493 F.2d at 1314. The Court held that a person is not primarily liable for failure to disclose a material fact unless he had a duty to disclose that fact.[9] *Coffey*, 493 F.2d at 1315. *Accord, Zweig v. Hearst Corp.*, 594 F.2d 1261, 1266–68 (9th Cir. 1979); *Staffin v. Greenberg*, 509 F.Supp. 825, 832–33 (E.D. Pa.1981). We concluded, in the context of Sec. 17(a)(2) of the Securities Act and Rule 10b–5(2), that "only those individuals who had an *affirmative obligation* to reveal what was allegedly omitted can be held as primary participants in the alleged deception. A duty to disclose naturally devolved on those who had direct contacts with the 'other side'." *Coffey*, 493 F.2d 1315 (emphasis added)." Direct contacts require neither physical presence nor face to face conversation.[10] A person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant. Conversely, a person who does not undertake to furnish any information, and who is not aware of what information has been furnished, is under no duty to disclose material information in his possession *Seiffer v. Topsy's International, Inc.*, 487 F.Supp. 653, 667 (C.D.Cal.1980). *See also McLean v. Alexander*, 599 F.2d 1190 (3rd Cir. 1979); *Zweig v. Hearst Corp.*, 594 F.2d at 1268. Our treatment of King's co-defendant, Mr. Coffey, is an example of the type of contact which creates a duty to disclose. Because Coffey had supplied some material information which was misleading because of an omission of fact, we decided that he could be liable as a primary participant. *Coffey*, 493 F.2d at 1314, 1319. Thus, we implicitly found that Coffey was in "direct contact" with the recipient of the information. *Id.* at 1314–15.

Our "direct contacts" analysis in *Coffey* reflects our concern that imposition of a duty to disclose upon persons not in direct contact with the "other side" would "effectively make corporate officials primarily liable for any securities law violation by a subordinate. It would disrupt corporate systems of delegation of authority and accountability...." *Coffey*, 493 F.2d at 1315. Imposing liability on those far removed from the transmission of the mis-

9. This court, in *Coffey*, did not say that the duty to disclose arises *only* when a person possessing material information is in direct contact with the "other side." Instead, this court indicated that direct contact between the parties is but *one* type of circumstance which will give rise to a duty to disclose. *See White v. Abrams*, 495 F.2d 724, 735–36 (9th Cir. 1974); *Zweig v. Hearst Corp.*, 594 F.2d 1261, 1268–69 (9th Cir. 1979) (columnist owes duty to disclose to readers because of a special rela-

tionship). *But see S.E.C. v. Great American Industries, Inc.*, 407 F.2d 453, 460–61 (2nd Cir. 1968). Further, a fiduciary-type duty may, in certain circumstances, serve as a basis for imposition of liability under Rule 10b–5. *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980); *S.E.C. v. Texas Gulf Sulpher*, 401 F.2d 833 (2nd Cir. 1968), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971).

10. *Coffey*, 493 F.2d at 1315 n.24.

leading information would require the use of some theory of vicarious liability.[11]

■ The district court's narrow reading of *Coffey* prevented it from fully developing the record and making the necessary findings of fact. We believe, however, that this record indicates that Patrick was a primary participant in at least one instance. The offering circular for the 1974 Garbage Division issue contained an income statement signed by Patrick. The income statement is alleged to be misleading because Patrick omitted several material facts.[12] We believe that this type of conduct satisfies the "direct contacts" requirement of *Coffey*, and is sufficient to permit a finding that Patrick was a primary participant. When an agent of an entity undertakes to transmit information, concerning that entity's securities or the entity itself, for the use of the investing public, he must disclose all material information in his possession necessary to make the statements not misleading. *E.g., Seiffer v. Topsy's International, Inc.*, 487 F.Supp. 653 (C.D.Calif. 1980). *Cf. IIT, International Investment Trust v. Cornfeld*, 619 F.2d 909, 915, 922 (2nd Cir. 1980) (misleading prospectus may serve as basis for primary liability).

■ Even if the district court's interpretation of the "direct contact" language were correct, we would still vacate its decision because it failed to analyze Patrick's conduct within the framework of secondary liability under an aiding and abetting theory. Usually, "a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *Coffey*, 493 F.2d at 1316. Having restated what we view to be the elements which must necessarily be proven to hold a person liable as an aider and abettor, we shall discuss them in the context of record before us.

Although the Commission argues that the securities laws were violated as a consequence of three distinct courses of action, we deem consideration of two of these arguments to be inappropriate. We believe that we cannot properly decide whether the alleged misappropriation of proceeds, and the alleged self-dealing by Patrick in connection with the Milhorn property are violations of the securities laws, and if they are violations, whether Patrick may be held secondarily liable. As we noted earlier, the district court failed to make findings of fact with regard to those issues.[13] To draw any conclusions from such a record would necessarily require us to engage in fact-finding.

■ Patrick's failure to disclose the "kickback" from Alcock makes him liable under Rule 10b–5 or Sec. 17(a), as an aider and abettor. The record, in this respect, is clear. Patrick admits that Alcock made the payments. The Commissioners testified that they were unaware that Patrick was receiving the payments, and Patrick testified that he could not "recall actually telling" the Commissioners that he was receiving the payments. The offering circulars

11. In essence, the Commission, in *Coffey*, attempted to hold King liable on the basis of *respondeat superior*. We refused to impose liability on that theory. *Coffey*, 493 F.2d at 1315. *Accord, Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 886 (3rd Cir. 1975); *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir. 1975).

12. Specifically, the Commission argues that the statement was misleading because it indicated that the Garbage Division had a net profit in the last half of 1973, but it failed to disclose that the paper profit was possible only because previous bond proceeds were used to make interest payments.

13. We recognize that this failure in part resulted from the lower court's narrow reading of *Coffey*, since the district court's interpretation had the effect of rendering many of the allegations made by the Commission inconsequential. We wish to emphasize, however, the importance of making general findings with respect to all issues raised in order to assure effective and efficient appellate review. *Ramey Construction Co. v. Apache Tribe*, 616 F.2d 464, 467–468 (10th Cir. 1980); *Morelock v. NCR Corp.*, 546 F.2d 682, 689 (6th Cir. 1976).

and the bond resolutions for the appropriate issues do not disclose the existence of the payments. Because these facts are not disputed we can properly decide this issue. *Air Terminal Cab, Inc. v. United States,* 478 F.2d 575, 578 (8th Cir. 1973); *Feldman v. Capitol Piece Dye Works, Inc.,* 293 F.2d 889, 891 (2nd Cir. 1961). *Cf. U. S. ex rel. Adams v. General Motors Corp.,* 525 F.2d 161, 166 (6th Cir. 1975) (where material facts are undisputed, court of appeals is not bound by "clearly erroneous" standard on review).

■ The initial step in our inquiry is to determine whether a securities violation was committed. *Coffey,* 493 F.2d at 1316. *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94–95 (5th Cir. 1975). We believe that at least one violation has occurred. The first requirement, that a fact be misstated or omitted, has been met. The record indicates that Alcock [14] did not disclose the payments to the investing public. The fact omitted is material if there is a "substantial likelihood that a reasonable [investor] would consider it important...." *T.S.C. Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The information omitted here was material in at least two respects. First, an investor, had he known of the payments, could have reasonably concluded that investment in the District's bonds was unwise because the kickbacks increased the costs of the offering.[15] Second, an investor could have concluded that the District's bonds were a poor investment because the quality of the District's

management was suspect. Such a conclusion is reasonable given the general manager's apparent willingness to advance his own interests at the expense of the District's interests. *See Kidwell ex rel. Penfold v. Meikle,* 597 F.2d 1273, 1293 (9th Cir. 1979) (undisclosed conflict of interest is material).

Scienter is not a problem in this instance. In *Aaron v. S.E.C.,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) the Supreme Court held that in an action brought by the Commission for injunctive relief, the Commission must prove scienter in order to establish a violation of Rule 10b–5 or Sec. 17(a)(1) of the Securities Act. *Id.* at 695, 697, 100 S.Ct. at 1954, 1955. To establish a violation of Sec. 17(a)(2) of the Securities Act, however, proof of scienter is not necessary. *Id.* at 697, 100 S.Ct. at 1955. This action was brought under Sec. 17(a)(2) and Sec. 10(b), and to the extent that the Commission relies on Sec. 17(a)(2), the Commission need not prove scienter.[16] As a practical matter, most violations which involve material omissions in the sale of securities can be enjoined by the Commission under Sec. 17(a)(2) of the Securities Act. Certainly, the type of conduct being discussed here is within the ambit of Sec. 17(a)(2), since it is axiomatic that, with regard to conduct affecting the *sale* of securities, Rule 10b–5(2) and Sec. 17(a)(2) are coterminous, except to the degree that proof of scienter is required by Rule 10b–5(2). For these reasons, we conclude that scienter is not a factor in determining if Alcock's failure to

---

**14.** Alcock, of course, must be the focal point of this initial inquiry. He is a primary participant because he was in "direct contact" with bond dealers who bought the District's bonds from him in the sense that he furnished them with nearly all their information regarding the district. *See Coffey,* 493 F.2d at 1315.

**15.** Since kickbacks were paid by Alcock from the compensation he received from the offering of bonds, his fee was higher than it would have been had he not paid Patrick his share. This excess cost to the district was reflected in Alcock's "spread"—the difference between his purchase price and his selling price. In fact, the Commission's expert witness, a person ex-

perienced in the Tennessee Municipal Bond Market, termed the offerings costs exorbitant and indicated that he doubted that some of the issues were feasible given the high offering cost.

**16.** In *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1023 (6th Cir. 1979), we concluded that in a private action brought pursuant to Rule 10b–5 the plaintiff must show, in order to meet the scienter requirement, that the defendant acted recklessly. Whether *Mansbach* should be extended to S.E.C. injunctive actions is a question we do not reach.

disclose the kickbacks is a violation of the antifraud provisions of the securities laws.[17]

Second, *Coffey* requires that Patrick have a "general awareness that his role was part of an overall activity that is improper . . ." *Coffey*, 493 F.2d at 1316. In determining whether Patrick had a general awareness that the activity is improper, "the surrounding circumstances and expectations of the parties are critical. If the alleged aider and abettor conducts what appears to be a transaction in the ordinary course of his business, more evidence of his complicity is essential." *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95 (5th Cir. 1975). Conversely, if the alleged aider and abettor conducts a transaction of an extraordinary nature, less evidence of his complicity is necessary. *Woodward*, 522 F.2d at 95–96. Here, Patrick engaged in a transaction which appears to be a breach of the fiduciary duty he owed the District, *Raht v. The Union Consolidated Mining Co. of Tennessee*, 73 Tenn. 1, 16–17 (1880); *Cherokee Fire Ins. Co. v. Ingraham*, 35 Tenn.App. 611, 250 S.W.2d 114, 116 (1952), and a breach of a statutory duty, imposed upon all public officials in Tennessee, to refrain from any conduct which would give rise to a direct or indirect interest in any contract entered into by the District. Tenn.Code Ann.Sec. 12–4–101; *Crass v. Walls*, 36 Tenn.App. 546, 259 S.W.2d 670 (1953). In enacting this statute, the state legislature has recognized that conduct such as Patrick's is inherently improper. Because of Patrick's status as a public official and his fiduciary relationship with the District, this transaction must be viewed as extraordinary. Consequently, less evidence is necessary to establish that Patrick was aware that his conduct was improper. The record indicates that Patrick was aware that his receipt of the kickbacks was improper. Patrick made every effort to keep the payments secret. He insisted that Alcock make the payments to a corporation which he owned, rather than to himself. In fact, the payments were so well concealed that Patrick's accountant was unaware of their existence. The transaction being of a questionable nature, and considering Patrick's actions to ensure that no one would be aware of his activity, no conclusion can reasonably be reached except that Patrick knew that his conduct was improper.

Third, *Coffey* requires that the accused aider and abettor "knowingly and substantially [assist] the violation" of the securities laws. *Coffey*, 493 F.2d at 1316, 1317. As we noted in *Coffey*, the analysis required by this factor must be particularly exacting in cases involving non-disclosure. Otherwise, "a person who is not primarily liable for a violation could yet be held personally liable (as an aider and abettor), even though he or she was unaware of the need to disclose information withheld by those primarily liable." *Coffey*, 493 F.2d at 1317. The Commission must show that the silence of the accused aider and abettor "was consciously intended to aid the securities law violation." *Coffey*, 493 F.2d at 1317. The Commission must prove either a culpable state of mind, or conduct from which a culpable state of mind can be inferred. *See Woodward*, 522 F.2d at 97. In *Coffey*, there was no evidence of culpable conduct. Here, however, we believe that the record contains several instances of culpable conduct, which compel the inference that knowing and substantial assistance had been given.

Patrick's assistance was clearly substantial. The principal conduct which distinguishes this case from *Coffey* is Patrick's efforts in obtaining approval of the resolutions authorizing the sale of the bonds. The record indicates that the Board of Commissioners invariably followed Patrick's recommendations in passing the bond resolutions. In fact, Alcock testified that he felt that the commissioners never understood the meaning of the resolutions. Had he not obtained the passage of the resolutions, no violation would have occurred, for there would have been no bonds to market. Similarly, had Patrick insisted that the pay-

---

**17.** The kickbacks which Alcock failed to disclose were part of his compensation as underwriter, and were paid to the General Manager of the issuer. Thus, the material omission was "in connection with the purchase or sale of securities."

ments be disclosed in the resolutions before he procured their passage, no violation would have occurred. Finally, Patrick was responsible for negotiating the terms of each offering and, in at least one instance, submitted information which was included in the offering circular. Given the extent of Patrick's admitted involvement, his assistance was substantial.

Having determined that Patrick's assistance was substantial, we must now decide whether it was knowingly rendered.[18] *Coffey*, 493 F.2d at 1316, 1317. We believe that the assistance was knowingly rendered. Patrick was aware that Alcock would receive a fiscal agent fee, and that he would receive part of the fiscal agent fee. He knew that the payments he received would continue only as long as he assisted in the passage of the authorizing resolutions. Finally, he knew, because of his involvement in the passage of the resolutions, that the resolutions did not disclose the payments he was receiving. Thus, the record permits no other conclusion except that Patrick was aware that his assistance was vital to every facet of the deception.

In sum, we conclude that Patrick is liable as an aider and abettor to Alcock. We believe, as a matter of law, that the record establishes secondary liability with regard to the kickbacks. We express no opinion regarding possible liability under any of the other theories urged by the Commission in its brief.

■ The district court's order denying the Commission's request for a permanent injunction and disgorgement must be vacated. With regard to the request for the permanent injunction, the relevant inquiry, in cases such as this is whether there is a substantial likelihood of future violations. *S.E.C. v. Koracorp Industries*, 575 F.2d 692, 698 (9th Cir. 1978); *S.E.C. v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978). Proof of past violations of the securities laws serves as a basis for an inference that future violations may occur. *E.g., S.E.C. v. Koracorp Industries*, 575 F.2d at 698. As the frequency and magnitude of the past violations increase, the strength of the inference also increases. We believe that the decision regarding injunctive relief must wait until the district court ascertains the number and the magnitude of the violations attributable to Patrick.[19]

Similarly, we believe that further consideration of disgorgement is necessary. The district court concluded that the Commission had failed to show, with any degree of particularity, any profits obtained by Patrick which were attributable to any illegal conduct. The district court did not consider whether Patrick should be required to disgorge all of the money he obtained as a result of the payments from Alcock. Because we hold Patrick liable for the failure to disclose those payments, we conclude that the district court should order Patrick to disgorge a sum of money equal to the total value of all of the payments he received from Alcock. We leave it to the district court to determine the precise amount that Patrick must disgorge.[20] If on remand the district court should find further violations of the securities laws, it would be justified in holding an evidentiary hearing to determine what additional amounts, if any, should be disgorged.

18. We note that in the phrase "knowingly and substantially assisted the violation" found in *Coffey*, 493 F.2d at 96, the adverb "knowingly" modifies the verb "assisted". Accordingly, the relevant inquiry is whether the accused knew that he was rendering assistance. To inquire otherwise, that is, to inquire whether he knew he was involved in a violation, would be redundant since this is the focus of the second factor in the analysis. *See Woodward*, 522 F.2d at 95, 96, where the court engages in a similar analysis for both the second and the third factors.

19. Of course, such factors as Patrick's age, health, retirement, and lack of opportunity are also factors which the district court should consider. These factors are not, in themselves, determinative. *See S.E.C. v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978).

20. It is undisputed that Patrick has received one-half of the fiscal agent fees received by Alcock. Absent the submission of further evidence by Patrick indicating that he received less than one-half of the fee, entry of an order requiring Patrick to disgorge that amount, whatever it may be, is appropriate.

Vacated and remanded for proceedings consistent with this opinion.