809 F.2d 297
 Blue Sky L. Rep. P 72,469, Fed. Sec. L. Rep. P 93,103
Franklin MOORE; Julia A. Moore, on behalf of themselves and
a class of persons similarly situated,
Plaintiffs-Appellants, Cross-Appellees, (85-3520)
v.
FENEX, INCORPORATED, et al., Defendants,
William West, Defendant-Appellee, Cross-Appellant, (85-3551)
and
Earle R. Frost, Jr. and Brownfield, Bowen, Bally & Sturtz,
Defendants- Appellees, Cross-Appellants, (85-3550).
 Nos. 85-3520, 85-3550 and 85-3551.
 United States Court of Appeals,
Sixth Circuit.
 Argued Sept. 23, 1986.
Decided Jan. 14, 1987.
 
 Michael E. Maundrell, argued John W. Hust, George D. Jonson, Cincinnati, Ohio, for defendants-appellees, cross-appellants.
 James R. Adams, Frederick J. McGavran, argued, Frost & Jacobs, Cincinnati, Ohio, for plaintiffs-appellants, cross-appellees.
 James R. Kirkland, argued, James R. Kirkland & Assoc., Dayton, Ohio, for defendant-appellee, cross-appellant.
 Before MARTIN, GUY and NORRIS, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Defendants Earle R. Frost, Jr., Brownfield, Bowen, Bally & Sturtz and William West appeal, and plaintiffs cross-appeal, judgment entered upon a jury verdict in this securities case. The case was brought as a class action under the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78a et seq., the Ohio Securities Act, Ohio Rev. Code Secs. 1707.41, 1707.43 and 1707.44, and Ohio common law claims of fraud and breach of fiduciary duty. After a lengthy jury trial, a verdict was returned in favor of plaintiffs on all counts. We reverse the judgment as to defendants Frost and Brownfield, and affirm as to defendant West. We also affirm as to the issues raised by plaintiffs.
 
 
 2
 The facts adduced at trial are rather complicated. Defendant Fenex, Inc., is an Ohio corporation organized in 1976 for the purpose of issuing and selling to the public joint venture interests in drilling various oil and gas wells in Ohio, primarily in Holmes, Perry, and Wayne Counties. HMW Company, Inc., a related organization, is an Ohio corporation organized in 1977 for the purpose of issuing and selling to the public limited partnership interests in oil and gas drilling equipment for specified oil and gas wells in this same area. Because Fenex and HMW are involved in Chapter 7 bankruptcy proceedings, this action was stayed as against them. Bethel Securities, Inc., is an Ohio corporation organized in 1978 to act as the sales arm of Fenex and HMW. A related non-party is Bethel Resources, Inc., the operating arm of the company, also currently involved in bankruptcy proceedings. These companies will be referred to by individual name or as the Bethel Group.
 
 
 3
 The Bethel Group companies were related by stock ownership, directorship and officers. As a group they were controlled by defendants Robert R. Hills and Rufus B. Hurst. Defendant William West was employed by Bethel Securities as a salesman selling HMW and Fenex programs from September, 1976 until February, 1981. In addition, West was elected to the Board of Directors of HMW in late November, 1980 and served until September of 1981. Defendant Frost was a partner in defendant law firm, Brownfield, Bowen, Bally & Sturtz. Between 1976 and approximately August or September of 1981, the Brownfield firm, through Earle R. Frost, represented the Bethel Group in all its dealings with the Ohio Division of Securities.
 
 
 4
 The plaintiff class consisted of all purchasers of Fenex oil and gas interests and HMW equipment ventures sold by Bethel Securities between mid-1976 through 1981. Plaintiffs alleged that during this time, defendants sold securities to the public in various oil and gas drilling programs and well equipment ventures. Plaintiffs' position was that basic representations in the offering circulars were false. The gravamen of their complaint was that defendants knew, or should have known, or intentionally remained ignorant of, the following material facts: (1) plaintiffs' investments were used as cash flow for the Bethel Group rather than the specific drilling programs and equipment ventures described in the offering circulars; (2) plaintiffs' oil and gas wells were not drilled in accordance with the timetables represented in the Fenex offering circulars; (3) contrary to express representations in the HMW offering circulars, plaintiffs' investments were transferred to Bethel Resources; (4) as a result of undertaking contractual obligations to drill about 75 oil and gas wells for an unrelated third party, the Bethel Group's problems in drilling and equipping oil and gas wells increased and magnified; and (5) through the use of "the sheet," the plaintiff class' investment funds were moved and shuffled between and among the companies in the Bethel Group and used for improper purposes, as a result of which plaintiffs' wells were not drilled and plaintiffs' equipment was not purchased. Plaintiffs alleged that none of the Bethel Group's operational, accounting and drilling difficulties or shuffling of investors' funds were revealed to past, present or potential investors. Rather, in an attempt "to play catch up" and to continue to generate funds to meet an increasing cash flow problem aggravated by rapidly spiraling inflation in the industry and exacerbated by the removal of investors' funds for improper purposes, as well as a complete lack of accounting and management controls and procedures, defendants continued to solicit funds from the public to cover past and current obligations. Plaintiffs sought $7.2 million, their total investment in the programs.Claims Against Frost and the Brownfield Firm
 
 I.
 
 5
 Defendant Frost, a partner in defendant law firm Brownfield, Bowen, Bally & Sturtz, prepared the offering circulars of Fenex and HMW. Plaintiffs set forth two types of misconduct against these defendants: that defendants made a material misrepresentation in the circulars by stating that funds collected for different well programs would be segregated and used only for that particular well; and that defendants omitted a material fact in that they failed to disclose the precarious financial position of the companies.
 
 
 6
 The trial court essentially granted a partial directed verdict in favor of defendants as to all circulars prepared before September 25, 1980. It was established at trial that Frost had no knowledge of wrongdoing before that time. After that date, seven circulars were prepared by defendants, four of which were offered by HMW Company and three of which were offered by Fenex. (See Joint Appendix, Stipulated Facts, Pre-Trial Order). The last offering, issued in September, 1981, was rescinded on the advice of defendant Frost and the money was refunded to the investors. Consequently, the preparation of six offering circulars was the basis for the jury's finding of liability against these defendants.
 
 
 7
 Defendants Frost and the Brownfield firm were found liable on claims of federal securities law violations, Ohio common law fraud and breach of fiduciary duty. Defendants have challenged the jury's verdict as to each of these claims.
 
 A.
 
 8
 Defendants Frost and the Brownfield firm challenge the finding of liability for breach of fiduciary duty in two ways. First, defendants contend that this issue was not properly pleaded against them and should not have been submitted to the jury. Second, defendants argue that they owed no fiduciary duty to the plaintiff investors.
 
 
 9
 It is undisputed that in count six of their complaint, plaintiffs set forth a claim for relief for breach of fiduciary duty against Fenex, HMW, Bethel Securities, and defendants McQueen and Hills. Frost and the Brownfield firm were not named in that count. Nevertheless, plaintiffs contend that the final pre-trial order controls the course of the trial, and that defendants were put on notice that an Ohio common law claim for breach of fiduciary responsibilities was asserted against them.
 
 
 10
 We note initially that this is not a case in which a plaintiff may argue that the issue was tried by consent of the parties. Our review of the record reveals no indication that defendants were or should have been aware that breach of fiduciary duty was actually being tried as against them. Accordingly, Fed.R.Civ.P. 15(b), permitting amendment of pleadings by implied consent, does not apply.
 
 
 11
 Issues incorporated in a pre-trial order may supersede the pleadings. Howard v. Kerr-Glass Mfg. Co., 699 F.2d 330, 333 (6th Cir.1983). The question then is whether the pre-trial order put the defendants on notice that they were being charged with breach of fiduciary duty. We are unable to conclude that it did.
 
 
 12
 The section of the pre-trial order that plaintiffs point to is the section entitled "Nature of Action and Jurisdiction." This section states:
 
 
 13
 This is a class action for compensatory damages arising under the Securities Exchange Act of 1934, as amended (the "1934 Act"), 15 U.S.C. Sec. 78, [78a] et seq., the Ohio Securities Act, Ohio Revised Code Secs. 1707.41, 1707.43 and 1707.44 (the "Ohio Act"), and Ohio common law claims of fraud and breach of fiduciary responsibilities. Plaintiffs also assert claims for punitive damages, which Defendants assert are not properly pleaded.
 
 
 14
 This section goes on to describe jurisdiction and venue, and the class nature of the action. Two sections later, plaintiffs' statement of the case is described, and the actions and positions of each of the defendants are generally set forth.
 
 
 15
 We cannot conclude that this pre-trial order would put Frost and the Brownfield firm on notice that claims advanced against other parties in the complaint were now being brought against them as well. The section plaintiffs rely on generally describes the claims set forth in the complaint; it does not indicate against whom those claims are being asserted. Furthermore, the order did not indicate that the complaint was being amended. There is no basis on which to hold that defendants should ignore a well-pleaded complaint and rely instead on a very general description of claims being asserted against multiple defendants, especially in the absence of a motion to amend or any other indication that all claims were now being asserted against them.
 
 
 16
 Plaintiffs also assert that even if not properly pleaded, defendants suffered no prejudice by submitting the breach of fiduciary duty claim to the jury. They contend that the jury's verdict demonstrates that neither Frost nor his firm could counter the evidence introduced on this issue. We find this rather circular reasoning to be without merit.
 
 
 17
 Under Ohio law, a fiduciary relationship, such as that alleged here, may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reposed. Umbaugh Pole Bldg. Co. Inc. v. Scott, 58 Ohio St.2d 282, 390 N.E.2d 320, 321 (1979). Because Frost and his firm were not on notice that breach of fiduciary duty was being raised against them, they had no reason to question the investor plaintiffs who testified as to their understanding of such relationship, if any. This information was critical to a reasoned defense of breach of fiduciary duty against Frost and the Brownfield firm.
 
 
 18
 Accordingly, it was error for the trial court to submit this improperly pleaded issue to the jury when defendants Frost and the Brownfield firm had no notice that this claim would be advanced against them and were prejudiced by such lack of notice. Consequently, the jury's verdict on this claim must be reversed.[1]
 
 B.
 
 19
 Defendants Frost and the Brownfield firm next challenge the jury's finding of liability for common law fraud. First, defendants assert that the trial court erred in denying their motion for directed verdict and judgment n.o.v. on this issue. Second, defendants challenge the court's instruction on liability for failure to disclose a material fact.
 
 
 20
 In Ohio, the elements of fraud are as follows: (1) There must be an actual or implied representation of a matter of fact; (2) which relates to the present or past, (3) which was material to the transactions, and (4) which was false when made. (5) The statement must be made with knowledge of its falsity, or with reckless disregard for whether it is true or not and (6) with the intent to mislead the other party into relying on it. (7) The other party must be ignorant of the fact averred, causing (8) justifiable reliance and (9) injury. Dunn Appraisal v. Honeywell Information Systems, 687 F.2d 877, 882 (6th Cir.1982).
 
 
 21
 Plaintiffs' first claim of fraud was that defendants misrepresented in the offering circulars that the funds invested would be segregated for use for the particular well offered. The evidence presented at trial indicates that Frost was told for the first time on August 28, 1980, that Fenex funds had been comingled into a cash management account. At that time, Frost insisted that the offerings currently "on the street" and all future offerings have separate accounts set up. He periodically checked the passbooks for these accounts to assure their continued use. Two of plaintiffs' witnesses supported Frost's testimony, and in fact indicated that Robert Hills, the manager of the companies, instructed them not to tell Frost that Fenex funds had been comingled. After September 28, 1980, the funds were kept in separate accounts until sometime in the late spring of 1981 when apparently, investors' funds were used for purposes other than drilling of their wells. Plaintiffs' witness, the accountant for the companies, testified that she was instructed not to tell Frost that funds were again being diverted for other uses.
 
 
 22
 The accountant also testified, and again this testimony was undisputed, that HMW funds had always been kept segregated and were not comingled in a cash management account until the late spring of 1981. At that time, although separate accounts were still maintained, the funds were apparently being diverted to uses other than that for which they were designated.
 
 
 23
 In short, the undisputed testimony at trial indicated that for the last six offering circulars in question, the funds invested were kept in separate accounts at the direction of Frost. It is also undisputed that Frost checked to assure the continued maintenance of separate accounts, and that when the funds were finally diverted, this information was kept from him. Accordingly, as to this claim, an essential element of fraud is absent: the representation that the funds invested would be separately maintained was not false.
 
 
 24
 The other allegation of fraud dealt with Frost's non-disclosure of the companies' financial troubles. Of the six offering circulars in issue, four of them dealt with HMW limited partnerships. Plaintiffs' witness, Rufus Hurst, the head of Bethel Resources, testified that at the time he revealed that Fenex funds had been comingled, Frost asked whether HMW funds were involved. Hurst told him that there were no problems with HMW. In early October of 1980, Hurst informed Frost that Fenex was short of funds to complete their well obligations. There was no indication that HMW was experiencing like problems. In the fall of 1980, Hurst undertook to determine the amount of Fenex's shortfall. There is documentary evidence of Hurst's efforts to calculate this amount; none of these documents implicate HMW. In fact, there is no evidence in the record that HMW was, at that time, experiencing financial problems. Accordingly, there was no evidence that Frost failed to disclose a material fact with regard to the HMW offerings.
 
 
 25
 Of the two Fenex offerings issued after September 25, 1980, the last, issued February 3, 1981, stated that the company was experiencing serious cash flow problems and was attempting to obtain a loan to remedy the situation. As to this circular then, the fact of financial difficulties was disclosed.
 
 
 26
 The remaining circular was the Fenex offering issued on December 9, 1980. Frost learned in early October that Fenex was short of money to finish its well obligations. At that time, Rufus Hurst began his attempts to determine the amount of money Fenex was short. He subsequently determined that $709,000 was necessary to finish the Fenex wells. When Frost learned that Fenex was experiencing cash flow problems, he reported that information to the Ohio Division of Securities. In the meantime, a loan was being negotiated with the Pittsburgh National Bank. On November 17, 1980, the bank sent a written commitment to loan at least $500,000, and possibly up to $1 million to Fenex. With the loan from the Pittsburgh bank and expected receipt of accounts receivable on a drilling contract with a third party, Hurst testified that by the end of November both he and Frost believed that the financial problem had been resolved. After these events, the Ohio Division of Securities gave the go ahead for further offerings.
 
 
 27
 We review the grant or denial of a directed verdict by the trial court under the same standard used by that court in determining whether or not it was appropriate to grant the motion:In considering a motion for a directed verdict under rule 50(a), the trial court "must determine whether there was sufficient evidence presented to raise a material issue of fact for the jury." O'Neill v. Kiledjian, 511 F.2d 511, 513 (6th Cir.1975). As applied in this context, "sufficient evidence" is such that, when viewed in the light of those inferences most favorable to the nonmovant, ... there is either a complete absence of proof on the issues or no controverted issues of fact upon which reasonable [minds] could differ. O'Neill, 511 F.2d at 513.
 
 
 28
 Sawchik v. E.I. Dupont Denemours & Co., 783 F.2d 635, 636 (6th Cir.1986).
 
 
 29
 We are convinced, after a careful and extensive review of the record, that reasonable minds could reach but one conclusion. There was no evidence of fraud as to the segregation of funds since the evidence indicated that the funds were, in fact, segregated at the relevant times. As to nondisclosure of financial condition, the undisputed evidence showed that by the time of the December 9, 1980 Fenex offering, all of the relevant parties involved felt that the problem had been solved. The documentary evidence supports this conclusion, i.e., commitment letter from the Pittsburgh Bank, and approval by the Ohio Division of Securities.
 
 
 30
 We do not believe that from this evidence reasonable minds could conclude that Frost intended to commit fraud. While plaintiffs would have us draw an inference of fraud from the ultimate collapse of the companies, all of the testimony and other evidence indicating what Frost knew, and how he acted on that information is to the contrary. Accordingly, we find that the trial court erred in failing to grant a directed verdict in favor of Frost and the Brownfield firm on the issue of fraud.[2]
 
 C.
 
 31
 Defendants Frost and the Brownfield firm next contend that the trial court erred in denying their motions for directed verdict and judgment n.o.v. on the issue of Sec. 10b-5 liability under federal securities law. Section 10b-5 is directed against false statements and omissions of material fact in connection with securities sales and purchases. Defendants were found liable on an aider and abettor theory. Usually, "a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." Securities & Exch. Com'n v. Washington County, 676 F.2d 218, 224 (6th Cir.1982) (citing Securities & Exchange Com'n v. Coffey, 493 F.2d 1304 (6th Cir.1974), cert. denied, 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975)).
 
 
 32
 As to the third requirement, the analysis required by this factor must be particularly exacting in cases involving non-disclosure. Washington County, 676 F.2d at 226. The plaintiffs must show that the silence of the accused aider and abettor "was consciously intended to aid the securities law violation," and must prove either a culpable state of mind, or conduct from which a culpable state of mind can be inferred. Id.
 
 
 33
 For much the same reasons as set forth in part B, we think these defendants were entitled to a directed verdict on this issue. Plaintiffs have failed to make any showing that defendant Frost consciously intended to aid a securities fraud violation. Frost's conduct, far from showing a culpable state of mind, indicates the contrary. Moreover, the evidence as to what Frost knew, when he knew it, and what he believed about the financial state of the companies is, as noted above, undisputed even by plaintiffs' own witnesses.
 
 
 34
 On this securities claim, plaintiffs have also alleged that these defendants were liable for nondisclosure of the fact that, in the past, Fenex had failed to segregate funds. However, the uncontroverted evidence demonstrated that when Frost discovered this fact, he first informed the Ohio Division of Securities, directed his clients to segregate all incoming and future funds, and periodically checked the accounts to assure that his advice was being followed. We fail to see how these facts could lead one to conclude that Frost consciously intended to aid a securities law violation. No inference of a culpable state of mind can legitimately be drawn from such conduct.
 
 
 35
 Accordingly, Frost and the Brownfield firm were entitled to a directed verdict on this claim as well. In light of the reversal of liability on the part of Frost and Brownfield, we need not address the other claims they raise.
 
 Claims Against West
 II.
 
 36
 Defendant William West appeals from the judgment entered below finding him liable for violations of federal securities law and Ohio securities law, and for common law fraud and breach of fiduciary duty. West was a salesman for HMW and Fenex securities. He also served briefly on the Board of Directors of HMW, from November, 1980 to October, 1981.
 
 
 37
 As to federal securities law violations, West was found liable both as a primary violator and as an aider and abettor. The jury found that West was not liable as a "controlling person" under Sec. 20 of the Securities Exchange Act of 1934.[3] West first complains that the only allegation contained in the complaint against him on federal securities law grounds was that he was a "controlling person." West therefore asserts that it was error to submit to the jury the claims of primary and secondary liability.
 
 
 38
 We must reject this argument for two reasons. First, West failed to object to the submission of these claims to the jury. Secondly, West was not prejudiced by the submission of these claims. Although we recognize that whether one is a "controlling person" within section Sec. 20 of the 1934 Act implicates different concerns than primary and secondary security law violations, West actually defended against all three claims. His position throughout trial was that he had never misrepresented material facts or failed to disclose material facts. He also continually asserted that he was unaware of any wrongdoing, and that he had no knowledge as to the financial dealings of the companies. Accordingly, it was not plain error for the court to submit these claims to the jury. Fed.R.Civ.P. 51.
 
 
 39
 West next complains that the trial court erred in failing to direct a verdict on all four grounds of liability: federal securities law violations, Ohio securities law violations, Ohio common law fraud and breach of fiduciary duty. These findings of liability were apparently based on the fact that after West became a director of HMW Company, he sold one last offering. Plaintiffs' alleged that at that time, February of 1981, West had knowledge that HMW Company was experiencing financial and management problems. In support of this allegation, plaintiffs presented West's notes of topics he wanted to discuss at a Board of Directors meeting held February 2, 1981. In these notes, West stated:
 
 
 40
 Now we are behind in all phases. Some of the causative factors are:
 
 Cost-overruns
 Mis-management
 Lack of control
 Poor planning
 Mis-directed activities
 Loss of time
 Poor to non-existent follow up
 Lack of priorities
 Lack of direction
 Incompetent personnel
 Lack of sales 1981
 
 41
 West also stated that "the company has been reduced to the struggling, grasping monster with which we are now faced, and with which, we are willing to attempt to put some semblence of business identity and honesty of operation back into its workings and influence."
 
 
 42
 Although the evidence against West cannot be characterized as overwhelming, drawing legitimate inferences in favor of plaintiffs, we believe there was conflicting evidence from which the jury could find West liable.[4]
 
 
 43
 By selling the securities with knowledge of their falsity, West would be liable under Sec. 10b-5 as a primary violator, since he would have directly participated in the deceit. Likewise, these facts would support aider and abettor liability as well; that is, that a primary violation had occurred, and that West had general awareness that his role was part of an overall activity that was improper, and that he knowingly and substantially assisted the violation.
 
 
 44
 Ohio Rev. Code Sec. 1707.41 provides for civil liability for fraud of a seller of securities:
 
 
 45
 [A]ny person who, by a written printed circular, prospectus, or advertisement, offers any security for sale ... is liable, to any person who purchased such security relying on such circular, prospectus, or advertisement, for the loss or damage sustained by such relying person by reason of the falsity of any material statement contained therein or for the omission therefrom of material facts, unless such offeror ... establishes that he had no knowledge of the publication thereof prior to the transaction complained of, or had just and reasonable grounds to believe such statement to be true or the omitted facts to be not material....
 
 
 46
 Because there was evidence presented that plaintiffs relied upon the representations of West, in addition to the other testimony noted above, there was sufficient evidence presented for the jury to find West liable for Ohio security law violations.
 
 
 47
 West also asserts in a conclusory manner that he could not be liable for common law fraud or for breach of fiduciary duty. However, a review of the elements of fraud, recited above, indicates that this evidence does support a finding that the last sale of securities by West constituted fraud. Likewise, since West admits that he owed a fiduciary duty to investors, this evidence also supports a finding that he breached that duty. Although West points to conflicting evidence in the record to indicate that he lacked specific knowledge of wrongdoing and that he acted in good faith, because there is some evidence from which a jury could find liability the trial court did not err in denying West's motion for a directed verdict.
 
 
 48
 Accordingly, the judgment of the district court as to defendant West is affirmed.
 
 Cross Appeal of Plaintiffs
 III.
 
 49
 Plaintiffs cross-appeal raising three issues. First, plaintiffs assert that the trial court erred in directing a verdict in favor of Frost and Brownfield as to offering circulars issued prior to September 25, 1980. Plaintiffs urge that there was sufficient evidence from which a jury could conclude that Frost and Brownfield were liable as primary securities law violators or as aiders and abettors.[5]
 
 
 50
 Plaintiffs sought to establish that Frost was aware of financial difficulties and mismanagement within the Bethel Group prior to September, 1980. To that end, they offered into evidence the following: (1) a letter from Frost in July, 1977, criticizing Robert Hills and Rufus Hurst for the "slipshod" work in connection with assembling certain information needed for an offering; (2) three items of evidence indicating problems with leases; (3) an item indicating that Fenex did not pay the delay rentals on a lease and therefore had to obtain ratification of the lease prior to drilling; and (4) evidence of untimely filing of tax returns.
 
 
 51
 The trial judge described the inference that these documents indicated that Frost was aware of fraud as a "quantum leap." We agree. In fact, the evidence adduced at trial, from plaintiffs' own witnesses, was that Frost was kept in the dark as to the financial dealings of Fenex and Bethel Resources until the Fall of 1980. The information relied on by plaintiffs simply does not support an inference of knowledge of the type of fraud which was later revealed. Accordingly, the trial court did not err in granting the directed verdict.
 
 IV.
 
 52
 Plaintiffs next argue that the trial court erred in ruling, as a matter of law, that Frost was under no duty to correct the offering circular most recently issued when he learned that Fenex had failed to segregate investors' funds. The trial court held that Frost and his firm could not be liable for misrepresentations or omissions in those offering circulars although Frost learned of them while they were being sold to investors.
 
 
 53
 Plaintiffs rely on SEC v. National Student Marketing Corp., 457 F.Supp. 682 (D.D.C.1978). In that case, attorneys for Interstate National Corporation were charged with aiding and abetting a securities law violation for failure to interfere in the consummation of a merger between Interstate and National Student Marketing Corporation (NSMC) once they learned that NSMC's financial situation was not as represented. The court held, at the least, that these defendants were required to speak out at the closing concerning the information they acquired, and advise their client that the merger not be closed until the information was disclosed and the merger again approved by Interstate shareholders.
 
 
 54
 In the instant case, we see no need to establish a hard and fast rule that an attorney has a duty to correct an offering circular when the attorney learns of a misrepresentation contained in the circular. Here, it is undisputed that Frost insisted that the funds collected at that time be maintained in separate accounts. Moreover, he periodically checked to make sure that the funds were being properly held. It is also uncontrovered that the funds collected from this offering and subsequent offerings were maintained as represented until the late spring or summer of 1981. In other words, rather than advising his clients to correct the offering circular, Frost insisted that his clients comply with the representations made in the offering circulars. Accordingly, we decline to hold Frost liable under these circumstances.
 
 V.
 
 55
 Plaintiffs' last claim is that the trial judge erred in failing to hold Frost and Brownfield jointly and severally liable with the other defendants on the state and federal securities fraud claims. Because we have reversed the finding of liability against Frost and Brownfield, we need not address this claim, and we express no opinion on the trial court's treatment of damages.
 
 
 56
 The judgment of the district court is REVERSED as to defendants Frost and Brownfield, Bowen, Bally & Sturtz, and AFFIRMED as to defendant William West and as to the claims raised by plaintiffs.
 
 
 
 [1]
 Our review of the record also leaves us in serious doubt that this claim could be maintained against these defendants. We think that like the Umbaugh case, plaintiffs, under the circumstances presented here, had no reasonable expectation that these defendants were acting on their behalf. Plaintiffs have failed to point to any case where Ohio common law extends a fiduciary duty in like circumstances. The cases they do rely on, dealing with federal securities law, are irrelevant to this issue
 
 
 [2]
 There was some dispute as to whether negligence will support a finding of fraud for failure to disclose under Ohio law. In fact, relying on Miles v. McSwegin, 58 Ohio St.2d 97, 388 N.E.2d 1367 (1979), the trial court instructed the jury that "a party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading." 388 N.E.2d at 1369. The problem with giving this instruction is that Miles was a case claiming fraudulent nondisclosure, a separate theory from fraud. This is clearly illustrated by the Ohio Supreme Court's reliance on Restatement of Torts 2d, Sec. 551. This section sets forth the elements of recovery for a claim of "fraudulent nondisclosure." First of all, the plaintiffs herein alleged a cause of action for fraud; there was never any allegation for the separate claim of fraudulent nondisclosure. Secondly, we doubt whether the claim of fraudulent nondisclosure is viable against Frost and Brownfield. The cases illustrate, and the Restatement supports, that this claim applies between parties to a business transaction. We are aware of no case, nor has any been cited, where a party has been held liable for fraudulent nondisclosure that had no direct dealings with the plaintiff. We believe this theory has no application to Frost and his firm
 
 
 [3]
 Under Sec. 20 of the Securities Exchange Act of 1934, a person who "controls" a person who violated the securities law, is liable to the same extent as the controlled person
 
 
 [4]
 On appeal, West has asserted that the last offering he sold to the Moores was a Fenex offering and not a HMW offering. However, at trial, West testified that the last offering he sold was a HMW offering. The Moores testified that it was either a Fenex offering or a HMW offering. Thus, the evidence on this issue was, at trial, in conflict. Accordingly, the jury was free to find that the last offering West sold was a HMW security and that West was liable
 
 
 [5]
 At trial, plaintiffs apparently only proceeded against Frost and Brownfield on an aider and abettor theory. It is unclear why they now assert primary liability against these defendants. In any event, since we find no liability on either theory, the issue is irrelevant