UNITED STATES SECURITIES and EXCHANGE COMMISSION, Plaintiff,

v.

John J. BRAVATA, Richard J. Trabulsy, Antonio M. Bravata, BBC Equities, LLC, Bravata Financial Group, LLC, and Shari A. Bravata, Defendants.

Case No. 09–12950.

United States District Court, E.D. Michigan, Southern Division.

Jan. 31, 2011.

Benjamin J. Hanauer, James G. Lundy, Jonathan S. Polish, U.S. Securities and Exchange Commission, Chicago, IL, Louis

P. Gabel, Michael J. Riordan, U.S. Attorney's Office, Detroit, MI, for Plaintiff.

Richard J. Trabulsy, Tampa, FL, pro se.

### OPINION AND ORDER CONTINUING PRELIMINARY INJUNCTION, ASSET FREEZE ORDER, AND APPOINTMENT OF RECEIVER, AND GRANTING MISCELLANEOUS RELIEF

DAVID M. LAWSON, District Judge.

The Security and Exchange Commission commenced this action on July 26, 2009 alleging that the defendants had engaged in the unauthorized sale of securities, and that the securities it offered for sale were part of a fraudulent scheme in which earlier investors were paid "returns" from new investments remitted by subsequent investors. That type of investment structure is commonly known as a pyramid or Ponzi scheme. The complaint alleges that the defendants' actions violated several provision of the Securities Act of 1933, the Securities Exchange Act of 1934, and various regulations promulgated under that legislation. With the complaint, the plaintiff filed an emergency motion for a temporary restraining order, to freeze the defendants' assets, and for the appointment of a receiver.

The Court entered a temporary restraining order and continued the order as an order of preliminary injunction with the consent of the parties at a hearing on August 4, 2009. Following the August 4, 2009 hearing, the parties reached an agreement that a Receiver should be appointed to handle limited operational and business matters of the institutional defendants, subject to modification of the scope of the Receiver's duties and responsibilities following an evidentiary hearing.

The Court held an evidentiary hearing, taking testimony from ten witnesses on October 21, 22, and 30, 2009 and January 14, 2010. The parties were given time to file post hearing briefs and proposed findings of fact and conclusions of law. The focus of the hearing was whether the preliminary injunction and receivership should continue, and whether certain aspects of the preliminary orders—most notably, the asset freeze order—should be modified or dissolved. In addition to the merits of the plaintiff's contentions as described in the complaint, the defendants made specific objections to freezing certain assets that, they argue, were acquired by funds other than investments by the investors in BBC Equities, LLC and Bravata Financial Group, LLC. Those assets include the following: (1) non-party bank accounts consisting of (a) Comerica Bank Account No. XXXXXXXX684 held jointly by Richard Trabulsy and his grandmother Lily Trabulsy; and (b) Comerica Bank Account No. XXXXXX9556 held jointly in the name of Antonio Bravata and his grandmother, Dylite Adams; (2) certain frozen assets consisting of (a) all assets that were accumulated prior to the date that BBC Equities received and accepted its first subscription agreements for the sale of limited liability membership units (approximately October 2006, rather than May–June 2006 as alleged in the complaint); and (b) assets that were acquired during the time that BBC offered and sold limited liability membership units, but either have no net asset value, are the subject of monthly installment payments required to avoid forfeiture of those assets and, assets that could be unfrozen and used to enable the Bravata defendants to retain experienced securities counsel and present a defense to the charges raised in the SEC Complaint, which include (i) a 1995 Ferrari purchased by John J. Bravata in June 2006; (ii) three Additional Vehicles used and paid for by John Bravata: John J. Bravata's 2005 Cadillac STS, Richard Trabulsy's 2006 Chevrolet Corvette, and Lily Trabulsy's 2007 Cadillac Escalade; (iii) insurance pol-

icies on John J. Bravata's life; and (iv) the balance of the retainer John Bravata paid to his bankruptcy counsel.

The Court entered an order on August 21, 2009 denying the defendants' request to unfreeze those assets, subject to the outcome of the evidentiary hearing.

For the reasons outlined below, the Court concludes that the plaintiff has demonstrated a likelihood of success on the merits of their claims; other pertinent factors favor the continuation of the preliminary injunction; the disputed assets likely were acquired from investor funds accumulated since the inception on May 1, 2006 of what came to be known as BBC Equities, LLC; the asset freeze order should continue in force; and the receivership should continue with the Receiver's duties remaining as described in the original order. The following constitutes the Court's findings of fact under Federal Rule of Civil Procedure 52(a)(2), followed by its application of the governing law.

## I. Summary of Testimony at Evidentiary Hearing

The plaintiff contends that BBC Equities was formed on May 1, 2006 and began receiving funds from putative investors on May 22, 2006. Bravata Financial Group was formed in January 2003. The plaintiff also contends that between May 22, 2006 and June 30, 2009, the defendants received $55.2 million from approximately 440 investors. The plaintiff maintains that at the end of 2008, BBC Equities had a negative net worth, with reported assets of $146,493,312 and liabilities of $158,005,354. By the end of June 2009, BBC Equities had available cash of $131,316.

The defendants argue that no investment in BBC Equities occurred until October 2006; they complied with regulations governing the offering of investment opportunities to "qualified investors"; although the company was on tenuous financial footings in the late spring of 2009, it had reached a settlement with the Michigan Office of Financial and Insurance Regulation concerning a cease and desist order that agency had issued in March 2009; and the company was on the brink of securing substantial funding that would have allowed it to fund rescission agreements with many of its investors.

The following is a summary of the testimony of the witnesses presented by the parties at the evidentiary hearing.

### Luz Aguilar

Luz Aguilar testified that she is the senior staff accountant at the Chicago office of the SEC who had the primary involvement with the examination of the defendants' books and records. After describing her qualifications, job responsibilities, and involvement in the case, she testified that BBC Equities is an "entity ... created to offer shares in investment in real estate," and Bravata Financial Group was "an entity that was used to market and sell the BBC Equities shares" as well as "insurance products." Evid. Hr'g Tr., Vol. II, Oct. 22, 2009 [dkt. # 136], at 158. John Bravata and Richard Trabulsy were co-founders of these entities; John Bravata was their chairman and Richard Trabulsy was their vice-chairman. Both Bravata and Trabulsy had signatory authority over two corporate defendants' accounts.

In the course of her work on the matter, Aguilar analyzed about 70 accounts, focusing on accounts for the two corporate defendants and bank records of the individual defendants. She put all of the transactions into an Excel spread sheet and sorted the transactions into different categories. The documents covered a period from May 2006 to sometime in April 2009, with some documents ranging into June 2009 or even later. Aguilar did not find evidence of any certificates of deposits held by BBC Equities or Bravata Financial Group other than the $300,000 and

$113,000 CDs mentioned in the Receiver's October 19, 2009 report.

Next, Aguilar authenticated SEC Exhibit 14, entitled Summary of Investor Funds, which she compiled based on various company records. She confirmed that during the time period between May 22, 2006 and June 30, 2009, BBC Equities raised approximately $55 million from investors and paid around $12.5 million back to investors, some in the form of cash interest payments and others as withdrawals of their principal investments. Through her, the government introduced the list of approximately 440 BBC Equities investors as SEC Exhibit 15. Exhibit 15 referenced individuals who invested in BBC Equities prior to April 30, 2009, but Aguilar said her review of bank records disclosed other investors who invested in BBC Equities after that date.

Aguilar testified that before June 2008, BBC Equities' securities were sold by BBC Equities's employees. But beginning June 2008, all the sales were done by Bravata Financial Group's employees. Prior to June 2008, BBC Equities paid its salespersons approximately $2.1 million for selling BBC Equities's securities. SEC Exhibit 17, entitled BBC Equities, LLC, Comerica Bank No. 1851841765, Sources and Uses Statement, listed approximately $7.6 million for Bravata Financial Group as "the monies that went from BBC Equities' account to Bravata Financial Group's account … [p]resumably to reimburse Bravata Financial Group for expenses incurred in the selling of BBC Equities' shares." Id. at 174. Aguilar authenticated SEC Exhibit 19, which showed that in 2006, 2007, and 2008, Bravata Financial Group earned $356,958, $143,052, and $214,593 in insurance sales, respectively; Exhibit 20, which summarized transactions in Bravata Financial Group's bank account; and Exhibit 21, entitled Summary of Funds to Defendants and Relief Defen-

dants, May 1, 2006 through June 30, 2009. She explained that the line item on Exhibit 21 identified as BBC Management, Inc. represented BBC Management, Inc.'s payment of payroll for the BBC Equities' employees beginning in August 2007.

Aguilar prepared SEC Exhibit 22 entitled Detail of Transactions for John and Shari Bravata, which summarized the transactions in John and Shari Bravata's bank accounts between May 19, 2006 and June 16, 2006. It disclosed that as of May 19, 2006, the balance in the account was $198.18; on May 22, 2006, there was a wire-in transaction of $100,000 from Roman Kuzma; and on June 9, 2006, there were two wire-in transactions from Roman Kuzma of $69,985 and $230,000.

Aguilar also prepared SEC Exhibit 23 (Bravata Financial Group, Comerica Bk Acct. # 1851841021, May 1, 2006 through April 30, 2009, Summary of transactions) and Exhibit 24 (Flow of Funds, John J. Bravata—Comerica Bk, May 19, 2006 through June 16, 2006). She explained that by tracing the movement of funds through the business and personal accounts, and applying the first-in-first-out accounting rule used by John Bravata, Bravata "used the monies from Mr. Kuzma's investment and Ms. Lilly Trabulsy's investment" to purchase his Ferrari in June 2006, and he could not have afforded the Ferrari without the money received from Roman Kuzma and Lilly Trabulsy. Id. at 184–85. She testified that a New York Life commission check in the amount of $60,000 was deposited and cleared the account on June 16, 2006, whereas the $90,268 price for Ferrari was paid in two transactions on June 13 and 16, 2009.

Aguilar also prepared SEC Exhibit 26 (Bravata, John & Shari, Comerica Bank—May 1, 2006 through April 30, 2009, and SCHWAB Accts—September 1, 2008 through May 29, 2009), which showed that

among other expenses, the Bravatas spent $87,000 on jewelry from September 2006 to December 2007; $50,000 for a boat in February 2008; $27,500 for hunting vacations in Canada and Russia; and paid a part of a $46,566 down payment on a $500,000 catamaran in early 2009. In addition, the exhibit reflects that John Bravata spent a total of $35,144 in car payments directly from the accounts of BBC Equities and BBC Management.

Referring to SEC Exhibit 27 (John J. Bravata, attachment to response dated April 17, 2009 to request for production of documents dated April 6, 2009), Aguilar testified that the Bravatas spent approximately $717,000 on the construction of a house on Hilton Road in Brighton titled in their names, and all of this money came from BBC Equities. She also testified that a BBC–Equities–related entity entered into a lease with an option to purchase property in Bonita Springs, Florida on December 2, 2006 and exercised that option to purchase it for $6 million on January 18, 2008. She said this rental property was never used to produce income for the companies. Referring to SEC Exhibit 21, Aguilar testified that John Bravata used a company credit card to pay for artwork, anti-age group therapy, jewelry, upgrades to cars, among other purchases, and never reimbursed BBC Equities for these purchases. Aguilar testified further that together, John and Shari Bravata used a little bit over $5.1 million of BBC Equities's funds for their own benefit over the course of the BBC Equities offering. In addition, Antonio Bravata received a total of $107,848.87 in BBC Equities' or related companies' checks. Referring to SEC Exhibit 29 (Antonio Bravata, Comerica Bk # 6820490487, April 10, 2006 through April 6, 2009, Sources and Uses Statement), Aguilar stated that Antonio Bravata paid for the houses and cars listed on that exhibit "[m]ostly from the monies he received from BBC Equi-

ties, Bravata Financial Group and his father, John Bravata. There were also some deposits of $127,000 from other entities. They appeared to be commissions for insurance sales." *Id.* at 193.

Next, Aguilar testified that she could not locate any record of the four books that John Bravata claimed on the company's Internet site that he authored.

Explaining SEC Exhibit 31 (List of BBC Equity LLC Investors after April 1, 2009), Aguilar testified that during the period from April 1, 2009 through June 30, 2009, BBC Equities received $4,255,343.73 in investor funds.

Aguilar acknowledged that she never looked at the corporate defendants' QuickBooks records and never requested an interview with Melissa Traver, BBC Equities' chief financial officer. When challenged on the question when BBC Equities began its offering of securities, Aguilar explained that she based her estimation on the first deposit of investor funds into John and Shari Bravata's personal account, even though the first deposit of investor funds into the BBC Equities' bank account did not occur until September 6, 2006.

She also admitted on cross-examination that she did not know for sure whether the entire $7.6 million that was transferred from BBC Equities to Bravata Financial Group constituted an investor funds transfer, whether Kuzma's transfers to Bravata's personal accounts constituted an investment in BBC, or what the purpose of the other transfers from the Bravata Financial Group into John Bravata's personal account might have been. Aguilar also conceded that she never made a compilation of Bravata's income other than from BBC Equities. She conceded that, for example, in reference to SEC Exhibit 26, she could not explain the origin of approxi-

mately $560,000 worth of check deposits or $127,000 in cash deposits.

## Robert DeFauw

The SEC called Robert DeFauw, a BBC Equities investor, who testified that he first heard about BBC Equities in the summer of 2006 through a coworker at Metaldyne, whose wife worked for John Bravata. DeFauw then attended the BBC Equities's presentation at the Ritz Carlton Hotel in Dearborn, during which John Bravata described the BBC Equities's investment program, stated that the firm invested in real estate, and used the term "angel investor" to represent that "[a]s an initial investor your money is protected and that all subsequent investors would have to lose all their money first before an angel investor would lose any of his." *Id.* at 113. According to DeFauw, Bravata stated during the meeting that "the returns were eight percent for a one-year investment, ten percent for three and twelve percent on five years," and they were "guaranteed." *Ibid.* DeFauw recalls that Bravata said that BBC would pay the returns from buying and selling real estate investments. Bravata did not say anything about other investors' funds being used to make interest payments or about investment funds being used to pay his salary or cover his personal expenses; nor did he disclose that the money would be used to pay commissions or finder's fees on the investments. *Id.* at 113–14. DeFauw also remembers that Mr. Bravata showed attendees a PowerPoint presentation that the SEC introduced into evidence as Exhibit 2A. The presentation represented guaranteed returns and no management salaries.

DeFauw characterized the presentation as a sales effort by John Bravata. He disputed the suggestion that the meeting was confined to an educational purpose of informing attendees about investing in real estate. He estimated that about twenty to thirty people attended the meeting at the Ritz Carlton.

Later, DeFauw met with John Bravata at BBC's Brighton office; the meeting was arranged by his co-worker's wife. During this meeting, DeFauw recalls Bravata stating that "outside of the guaranteed . . . ten percent per year, if he didn't double my money, he wasn't doing his job." *Id.* at 117. In reliance on Bravata's representations, DeFauw invested $50,000 on September 22, 2006 at ten percent for three years. DeFauw denied receiving a private placement memorandum from BBC Equities until the SEC provided him with a copy. The last time DeFauw received interest was for the first quarter of 2009.

## John J. Bravata

Plaintiff SEC called defendant John J. Bravata as an adverse witness at the evidentiary hearing. Mr. Bravata frequently invoked his Fifth Amendment privilege against self-incrimination in response to many of the questions. Mr. Bravata admitted to recognizing some pages of SEC Exhibit 2 entitled "Bravata Real Estate Empire." SEC counsel was particularly concerned with page 16 of the exhibit entitled "Guaranteed Return," which discussed ten percent annual guaranteed return of money. However, Bravata never admitted to authoring this document. Evid. Hr'g Tr., Vol. I, Oct. 16, 2009 [dkt. # 135], at 20–21.

When questioned about promising investors that their prospective returns would be guaranteed by virtue of Comerica Bank's certificates of deposit, Bravata invoked his Fifth Amendment privilege. Bravata stated, however, that he did not doubt the accuracy of BBC Equities's December 31, 2007 financial statement stating that as of the time of the report, BBC Equities only held one certificate of deposit in the amount of $300,000. *Id.* at 22–25.

Bravata admitted that BBC Equities "paid a lot of money to BBC Management," *id.* at 27, although when asked if he had promised not to take a salary unless BBC Equities did well, he invoked the Fifth Amendment. He said the he did not tell prospective investors that BBC Equities depended on its continued receipt of cash from investors to operate.

Bravata admitted receiving a salary "for a couple of months in 2009," *id.* at 30, but invoked the Fifth Amendment when asked whether he received a salary regardless of whether he made a profit for BBC Equities's investors. He acknowledged that BBC raised approximately $48,544,441 from investors as of April 25, 2009 while spending $20,669,944 on real estate transaction.

He admitted that he was building an 18,000 square foot house on Hilton Road in Brighton that included a gym, a library, and a theater, but he invoked the Fifth Amendment when asked whether the investors' money went toward construction of his house in Brighton. Concerning the financial health of BBC Equities, Bravata stated, "We were definitely struggling when a cease and desist order came in from the State of Michigan. We were dealing with that, and quite honestly, I think the actions of the SEC and what you have done has destroyed this company unilaterally. . . ." *Id.* at 42. But he admitted that before the SEC brought its action, he retained a bankruptcy attorney to explore prospects of getting bankruptcy protections for both himself and BBC Equities. Similarly, Bravata reaffirmed figures contained in SEC Exhibit 5 that, as of June 10, 2009, BBC Equities had at most $1,480,877 in liquid funds.

Examining BBC Equities' profit and loss statement for January through May 2009, Bravata admitted that the company's total income for January was around $86,000 and total expenses amounted to over $1,287,000. Total figures for January through May 2009 were $552,219.13 for income and $5,953,912.64 for expenses. When asked about the recorded management fees of roughly $1.6 million for the months of January through May 2009, Bravata acknowledged that this category would have included his salary, which he might have taken "for a couple of the early months, January, February . . . I believe in April that I stopped taking income, but I may have . . . stopped taking income earlier than that." *Id.* at 56. He also confirmed that in the fall of 2008, BBC Equities notified the Huntington Bank that it could not pay on some of its loans and the value of some of the mortgaged properties was less than the amount of the loans secured by those properties. Finally, Bravata agreed that some of BBC Equities's properties were encumbered beyond their values.

### Antonio Bravata

Antonio Bravata, John Bravata's twenty-one-year-old son, admitted to being a sales agent for Bravata Financial Group. When asked about being a sales agent for BBC Equities or any activities in the capacity of BBC Equities's sales agent, Antonio Bravata initially invoked his Fifth Amendment privilege against self-incrimination. When confronted with the checks issued to him from BBC Equities, however, Antonio Bravata acknowledged that he received compensation from BBC Equities when investors he met with made investments in BBC Equities. He again invoked the Fifth Amendment when confronted with SEC Exhibit 8, Finder's Fees—2007 and 2008, which reported that Antonio Bravata earned $198,858.80 in finder's fees, and SEC Exhibit 9, which verified that the BBC Equities reported to the government that in 2006 it paid Antonio $110,555.48.

Antonio Bravata acknowledged publishing a book entitled *The Wealth Creator:*

*Let's Make Millions.* Of particular interest was the "life plan" that he says he achieved: within three years, he accomplished his dreams of owning a million dollar house, a slick sports car, and a vacation home, among other things. SEC Exhibit 11, at BBC 06124–06125. Antonio Bravata admitted that he purchased his house at 372 Lenox Lane for $340,000, owned a vacation home at 7621 Elmbrooke Way in Brighton, and acquired a 360 F1 Ferrari sometime before October 4, 2009.

### Shari Bravata

Shari testified that the only source of her income from May 2006 through July 2009 was her husband, John Bravata. Shari testified that she and her husband resided at 9354 Amherst Drive in Brighton, Michigan and used a beachfront home located at 26868 Hickory Boulevard in Bonita Springs, Florida. She also testified that in January 2008, she and her husband bought property at 8485 Hilton Road in Brighton. Shari Bravata testified that on August 15, 2008, her husband bought a Maserati Quatro and admitted she drove it almost exclusively; and she ultimately acknowledged that the title to the vehicle was in her name.

Shari Bravata recalled that in March 2007, her husband purchased for her a diamond-encrusted gold Rolex watch, which, according to the invoice (Gov't Exhibit 12), cost $19,680. In November 2007, she received a two-karate diamond ring as a ten-year wedding anniversary gift, which, according to the invoice, cost $34,896. She also testified that earlier that year her husband bought her a white gold and diamond butterfly ring.

Next, Shari Bravata testified that she was issued a BBC Equities corporate credit card. She understood that "everything that I put on the card was paid for out of John's paycheck," but she admitted that she has never seen John Bravata pay the bills personally. She readily admitted that nothing she charged on the card was for BBC Equities business, and that she used the card to cover expenses of a March 2008 trip to New York to watch Broadway shows, to fly at least twelve of her friends and family members from Detroit to Orlando for a Disney cruise in March 2008, to fly herself and her children to a vacation home in Bonita Springs in June 2008, and to pay to see the play *The Little Mermaid* in New York in October 2008.

### Roman Kuzma

Roman Kuzma was the source of the funds that the SEC contends were the first invested in BBC Equities in May 2006. Kuzma was called as a witness by the defendants and stated he met John Bravata through his son Todd, who worked for Bravata at some time. Kuzma said he became interested in investing with Bravata, developed a personal friendship with him and his mother, and decided to go fifty-fifty on the investment in the Brighton office building for BBC Equities. Kuzma testified that before the May 2006 investment in BBC Equities, he and John Bravata invested together in two other real estate transactions as half-owners. When shown copies of wire transfers into accounts of various Bravata Holdings (Defs.' Ex. 102), Kuzma confirmed that "[t]hese were all intended ... for us to renovate the two buildings," one in Brighton and another one in Ferndale. Evid. Hr'g Tr., Vol. II, Oct. 22, 2009 [dkt. # 136], at 279, 282. Kuzma denied that these investments went in BBC Equities and denied any intent to invest into BBC. However, under questioning by plaintiff's counsel, he acknowledged entering into a settlement agreement with John Bravata in which Kuzma received 3,000,000 shares of the Class A membership interests in BBC Equities in exchange for the advances he had made aggregating $890,000.

Kuzma testified that he kept track of the amounts that Bravata owed him from the original advances in a note dated November 2, 2006, which was introduced into evidence as Defendants' Exhibit 106. However, the settlement agreement recites that Kuzma rejected a proposal to treat his advances as personal loans to Bravata and elected a transfer of 3,000,000 Class A shares from Bravata instead. He acknowledged that at some point, he accepted Bravata's invitation to "move the two buildings into Bravata Financial," *id.* at 288, although he could not remember the exact date, and he consented to assignment of the real estate to BBC Equities.

Kuzma also testified that he was aware that John Bravata bought a Ferrari, but he did not have any reason to believe John Bravata purchased the vehicle with his money.

### James Deakin

James Deakin testified that he met John Bravata in early July 2006. He testified that he attended the same seminar at the Ritz Carlton hotel that Mr. DeFauw attended, which he viewed as a seminar with a broad educational bent. Unlike De-Fauw, however, Deakin did not recall seeing a page of the presentation referencing guaranteed returns or hearing John Bravata guarantee the returns. Deakin recalls being contacted by a Ms. Francis following the seminar and making an investment in March 2007 after receiving the Private Placement Memorandum (PPM). Finally, although Deakin remembers John Bravata's references to "angel investors," he understood this term to mean "providing monies to startup companies or entities, seed money." *Id.* at 315. He denied hearing any references to guaranteed investments, and he did not understand his investments into the company to be guaranteed. He did recall Bravata describing his philosophy of "safety first, returns second," as well as his representation that "he

doesn't make money unless he makes money for the BBC Equities' investors," during subsequent seminars that he attended in January or February of 2007. *Id.* at 320–21.

### John Sellers

During various periods of time, John Sellers served as counsel for BBC Equities, John Bravata, and Bravata Financial Group. He became BBC Equities's general counsel in October 2007. Sellers recalled that BBC Equities was originally known as Bravata Holdings 10. The company's organizational articles were filed in May 2006, and following Sellers's engagement those articles were amended In February 2007 to change the name to BBC Equities, to authorize different classes of securities, and describe the relative rights and priorities of those classes of securities. He had not been informed that BBC Equities had any investors at the time. He had to rely on information about the company provided by John Bravata and the people working for him. Sellers testified that he had previous experience with security offerings that were exempt from the registration requirements.

Sellers said he understood that the BBC Equities offering that was reflected in the PPM that he prepared was limited to accredited investors. Sellers prepared the PPM while a partner at a private law firm, and for the six months before he joined the BBC Equities as a general counsel he continued to advise BBC Equities on real estate transactions and was engaged to "prepare an update and prepare a new private placement memorandum for BBC." *Id.* at 346. He completed the second PPM dated April 17, 2008 while working in house. In that PPM, Sellers disclosed that the issuer could apply proceeds from investor funds to pay distributions and redemptions to other investors. Sellers explained that it was his intention to set out

in the PPM that only accredited investors were able to subscribe to the offering.

Sellers also testified that he approved many other investor materials apart from the PPM, although he asserted the attorney-client privilege when asked it he prepared a brochure entitled "Fun Facts." It was also his responsibility during his in-house counsel tenure to manage the company's compliance with various regulations. At the same time, Sellers asserted that he did not have authority to make a final decision whether to offer a proposal to investors, and he stated that "compliance-type issues would be generally run by me or the company's chief—or Bravata's chief compliance officer." *Id.* at 364–65.

Sellers confirmed that he was never present during Bravata's meetings with prospective investors and did not know that Bravata told investors that their returns would be guaranteed. When questioned further, Sellers testified that he would be concerned if he learned that the free lunch seminars ended with a sales pitch for BBC Equities because of Regulation D restrictions. Sellers admitted that during his employment with BBC, he did not have access to the company's financial information, including information about how much BBC was paying John Bravata, how much money the company was making from investments, and what the company's debts and expenses were. Finally, Sellers testified that, had he known that less than half of investor proceeds would be used for real estate investments, he would have put that disclosure in a PPM. Sellers did not know that BBC Equities had more than 35 unaccredited investors.

Sellers separated from BBC Equities on June 12, 2009. He acknowledged participating in the discussion of a rescission offer with the State of Michigan around that time.

### Melissa Traver

Melissa Traver testified that she was employed as BBC Equities' Chief Financial Officer from November 1, 2007 through the end of July 2009. She recalls using QuickBooks and maintaining discrete QuickBooks folders for BBC Equities and Bravata Financial Group. She also testified that "BBC wasn't formed until September of 2006, so any offering—you know, any of the investments that came in, it was after that. I believe September 19 [of 2006] was the actual formation of BBC Equities." Evid. Hr'g Tr., Vol. III, Oct. 30, 2009 [dkt. # 137], at 398. The first bank account in BBC Equities's name was opened in August 2006, and the first activity in this account took place in September 2006. Nonetheless, Traver saw Kuzma as "a main investor in the company" who "kind of took ownership over some of [the properties] and, you know, collected money from the parking lots and that kind of thing. . . ." *Id.* at 400.

Traver testified that neither Michigan Office of Financial and Insurance Regulation nor the SEC asked her to provide the QuickBooks data she kept, and she was not invited for an interview by either. Traver opined that without QuickBooks, the SEC could not examine the company's operations adequately. However, Traver acknowledged that she refused to speak to SEC representatives and that she was represented by the same attorney as the defendants.

Concerning the company American Express cards, Traver testified that when the company would receive the AmEx bill, Bravata's and Trabulsy's assistants would itemize the charges as business or personal and Traver would pay the bill. However, Traver would keep track of the personal expenses under a loan account ledger for Mr. Bravata and Mr. Trabulsy. Traver clarified that the five cards under the

BBC Equities' name were obtained on the strength of Mr. Bravata's or Mr. Trabulsy's credit, and the bill actually came in the name of Richard Trabulsy. Traver authenticated defendants' Exhibit 13–A, which contained the breakdown of Richard Trabulsy's, Shari Bravata's, and John Bravata's respective personal expenses.

Traver said that the same records itemizing personal expenses were produced to the SEC in response to its request for production. Traver disagreed with Luz Aguilar's assertion that no personal expenses that were charged on the company credit card were reimbursed, pointing to a page of Exhibit 13–A, which she said contained Trabulsy's monthly breakdown, showing a "check number and amount for the personal charges that he paid back to the company." *Id.* at 412–13.

According to Traver, Bravata and Trabulsy overpaid the company for credit card charges, and BBC entities actually owed John "just over $200,000." *Id.* at 414. Traver recalled that the company owed Trabulsy as well, although she could not recall precisely how much. When pressed on that point, Traver explained that if one were to set off these "loans" for personal expenses against Bravata's and Trabulsy's salary, the setoff would actually favor Bravata and Trabulsy. However, Traver ultimately acknowledged that only BBC Management paid John Bravata a salary; the loans were interest-free; and although both Bravata and Trabulsy would occasionally make payments towards these loans, neither has done so since April 25, 2009.

Traver testified that she never got the feeling the company was involved in a Ponzi scheme, but she was aware that the PPM authorized the company to pay initial investors from the proceeds received from subsequent investors.

Travor testified that she was in charge of paying for the educational seminars organized by Bravata Financial Group. She also testified that the Bravata Financial Group ceased paying for the seminars in September 2008 because "they just weren't bringing the business that we thought they would bring in. It was just way too much of an expense." *Id.* at 422–23. The Kalamazoo office of the company continued holding the seminars until November 2008 because "they had just basically opened and we were trying to get them up and running." *Id.* at 423. Traver explained that John Bravata was not a typical presenter at these seminars; those seminars were primarily a responsibility of six designated employees within the company. *Id.* at 424.

Travor also testified that beginning June 1, 2008, Bravata Financial Group hired sales agents, including Antonio Bravata, on a salary basis. She said John Bravata receives a salary from BBC from January of 2008 until February 2009. She clarified that John Bravata was paid by BBC Management. John Bravata received some pay in 2007 from Bravata Financial Group until February 2009. Traver was privy to other sources of Bravata's income: an interest in Strategic Breakthroughs and RGR Group. She also saw John Bravata's W–2, which reflected some life insurance commission income.

In April 2008, Trabulsy and Bravata hired Chief Executive Officer Brian Moran to run the day-to-day operations of the company, and in September 2008, fund manager Richard Surveski. Surveski was paid $60,000 each month and Moran "in the neighborhood of $250,000 to $300,000 a year." *Id.* at 430. The legal department of the company included Mr. Sellers, two legal assistants, and two other lawyers. The company had independent information technology, human resources, and accounting departments, and a real estate advisory team. The company was managed by a six-person board. When the Michigan Of-

fice of Financial and Insurance Regulation commenced investigation into the company, Bravata Financial Group hired a chief compliance officer, Bruce Coleman.

Although Traver was not sure about the dates of Coleman's employment, she recalled that near the time Coleman joined the company, the board decided to acquire a broker-dealer in Chicago. On April 27, 2009, an affiliated company named Strategic Institutional Consulting Group was approved by the SEC to be a registered investment advisor.

After the Michigan Office of Financial and Insurance Regulation issued a cease and desist order to BBC Equities on April 1, 2009, Traver said the investor funds that were received after the cease and desist order were "either, one, not in the State of Michigan, . . . or two, they were already in process at the time that the cease order started, so they were just in the processing and we were just waiting for the transfer to come in or that kind of thing." *Id.* at 434–35. Traver testified further that all qualified investor funds went through a third-party company, Equity Trust in Ohio.

Traver remembers that in June 2009, John Bravata instructed the staff of all his companies not to conduct any further offerings. She believed that a rescission offer that was part of the settlement agreement with the Office of Financial and Insurance Regulation was to be made to the investors. When asked how the company would be able to fund the offer, Traver explained:

> At the end of July, I believe it was the 23rd of July, Mr. Bravata had acquired 40 million dollars in assets that we were going to use to back a letter of credit. That money was going to be used to purchase the broker-dealer in Chicago that I mentioned. It was going to be used to liquidate those people that had requested. It was going to be money

put into an escrow and have some working capital money left.

*Id.* at 441. Traver testified further that apart from the $40 million deal, "[w]e had another deal going with Huntington Bank regarding our Timberstone portfolio," and this deal was worth about $75 million. *Id.* at 443.

Traver's information about these potential funding sources appears to be other than firsthand, however. She testified in response to questions by the SEC that she did not know details about the $40 million of assets sufficient to back the letter of credit. She believed there was some sort of agreement, but did not know whether the agreement was oral or written; she just heard about the arrangement during the board meetings. Although she was BBC's CFO, she was not privy to the details about the assets BBC Equities would be given to back the line of credit; she just believed that "some assets were going to be used that belonged to this broker-dealer in Chicago to put up a letter of credit that BBC Equities could be the beneficiary of." *Id.* at 463. Traver testified that on July 23, 2009, there came into existence some sort of agreement under which BBC Equities would be gifted assets sufficient to obtain a $40 million letter of credit, but she did not know whether BBC received the assets, what kind of assets these were, which bank would have issued the letter of credit, or the name of the broker-dealer in Chicago.

When asked about the "75 million dollar deal," Traver explained that Huntington was willing to refinance BBC Equities's loans at a reasonable value and give BBC a $75 million loan. However, she did not know any details about the loan, who rescinded the deal, how far it had progressed, or whether it was reduced to writing. She only heard others talk about it. No documentation was presented at the hear-

ing to support either of these putative funding sources.

Traver described Phoenix Venture Capital as "a new fund that we were trying to get up and running that would invest in not only real estate, but several other things." *Id.* at 443. Under the rescission offer with Office of Financial and Insurance Regulation, investors in BBC Equities could roll their investments from BBC Equities to Phoenix Venture.

Traver testified that the Bonita Springs, Florida property was acquired by BBC Equities as a rental property, and it was used "some by John personally and his family," as well as by "investors, ... for charity purposes, ... [and] for business meetings," and even for hosting families from the military. *Id.* at 447–48. Although the property was listed for sale, it never sold.

As for the Hilton Road property in Brighton, Traver testified that BBC loaned money at ten percent to John Bravata to build his house because Bravata could not obtain credit in his own name. According to Traver, the ledger for this loan was separate from all other ledgers. However, Traver admitted she did not know whether the ten-percent loan agreement between Bravata and BBC Equities was ever formalized or whether BBC started paying the money prior to entering an agreement.

Traver acknowledged that BBC Equities was losing money on an operational basis. The profit and loss statement she prepared (SEC Exhibit 6) disclosed that in January 2009, revenue was slightly over $86,000 but expenses exceeded $1.2 million. From January through May 2009, income was $552,219 and expenses were $5.4 million.

When questioned about SEC Exhibit 78 (Investor Dollar Expenditure Analysis, From May 1, 2006 to [end of April 2006]), Traver acknowledged that BBC Equities received just under $50 million in investor proceeds. The exhibit also confirmed that $762,586 of investor proceeds were used to finance the Bravatas' new house construction. When asked about the $3.4 million that BBC Equities lent to affiliated entities, Traver explained that the recipient was Bravata Financial Group; BBC Equities was loaning money to Bravata Financial at zero-percent interest because Bravata Financial was "in a huge expansion period." *Id.* at 488–89. In addition, BBC was paying Bravata Financial a flat-rate engagement fee of $4.7 million, which came directly from investors' proceeds. Traver explained that the fee paid for "[Bravata Financial Group's] sales force ... selling BBC Equities." *Id.* at 498. In addition, the investors paid over $5.8 million in salaries and compensation, plus $816,000 in professional fees. As one might predict, Bravata Financial did not repay a penny of its loan from BBC.

Traver also confirmed that BBC Equities "loaned" about $805,000 to management in connection with their use of AmEx cards, and clarified that this figure is distinct from the loan for building the Hilton Road property. She also testified that those amounts were net of any payments the individual defendants made to repay their private expenses. With respect to the charges made on individual defendants' AmEx accounts, Traver stated that on at least one occasion, John Bravata wrote a check to BBC Equities to reimburse for Shari's charges on the card, but she acknowledged that she did not check whether it was done more than once.

### James Bravata

James Bravata, John Bravata's younger brother, testified that he started working as an agent for Bravata Financial Group on May 1, 2008, but was never an officer, director, or member of Bravata Financial Group or BBC Equities. Immediately before joining Bravata Financial Group,

James had an agency of his own. He had little interaction with his brother John and only offered a "handful of clients" to BBC Equities. *Id.* at 547–48. He described his financial arrangement as a sales agent, which included a $20,000 advance typically given to agents for seminar activity "so that I could continue doing long-term care and estate planning workshops, which are life insurance type products." *Id.* at 552. Quarterly compensation was based on production in the previous quarter.

In July 2008, James was offered the position of managing partner of the southeast Michigan office, which he occupied until October of 2008. On January 1, 2009, James left Bravata Financial Group and joined BBC Equities as the Director of Operations for the BBC's Trust Department. He gave a confusing description of his duties as the Director of Operations, which had something to do with processing applications and communicating with custodial companies, such as Equity Trust and Pensco Trust, and putting internal control measures in place.

James said he was involved in the discussions concerning acquiring a broker dealer. He testified that a company called National Financial Services was a "shell broker-dealer," which was "sort of like a turnkey that would be able to jump right into." *Id.* at 563. In addition, he stated that John Bravata "had a relationship with an up and going broker-dealer out in Chicago and they made out an arrangement to purchase that broker-dealer," although this arrangement collapsed when the SEC filed its action. *Ibid.*

James Bravata then clarified Phoenix Venture Capital's role in BBC Equities's business. He stated that BBC Equities stopped raising funds around June 1, 2009, so "all the funds that we had received, this was the new company that received new subscriptions." *Id.* at 571. He testified

further that Phoenix Venture Capital issued a PPM prepared by outside counsel.

James Bravata explained that he distributed PPMs to each general office of BBC Equities, and the managing partners of these offices (and their administrative assistants) kept a log of the distributed PPMs. *Id.* at 576–77. James testified that he had set up the intranet system through which each agent could get the relevant information about each sale of BBC securities from the Compliance Department. He blamed his predecessor, Katie Witkowski, for not documenting properly the receipt of some PPMs in the past. He conceded, however, that he did not know whether, at any time prior to 2009, individual investors received PPMs from BBC Equities.

James Bravata also admitted that he was never privy to the financial situation of the company, apart from the investments that he saw coming in. Nor did he know whether BBC Equities or Bravata Financial Group had enough money to purchase a broker dealer in the summer of 2009. He revealed that his salary was $225,000 per year when he was a managing partner at Bravata Financial Group, and dropped to $150,000 until the second pay period of March. James also stated that prior to joining the BBC Equities, he did offer BBC Equities' investments to his clients at Bravata & Associates II (his own insurance agency) and received an eight-percent finder's fee without disclosing that fact to the buyers.

**Exhibits**

The parties offered multiple exhibits in the form of documentary evidence. In addition, both parties offered digital evidence: the defendants presented their Exhibit 143, which is a recording of a conference call by John Bravata to investors on June 18, 2009; and the SEC offered its Exhibit 1, which is a video recording of a

presentation by Antonio Bravata, and another by John Bravata in January 2008.

In Exhibit 143, John Bravata conducts a conference call with unidentified investors. He refers to the Private Placement Memoranda, states that BBC Equities's customers did not lose money in 2008, represents that he stepped down from running BBC Equities's day-to-day operations when Richard Surveski was hired for that role, and explains that he wants his company to sell funds on "a broker-dealer platform." Bravata is heard saying that the money investors had paid in to date was used to "build out the infrastructure" of the company. He says that the future of the company depends on getting new investors into the company. He discusses the investigation by the Michigan Office of Financial and Insurance Regulation. He also introduced a new venture capital fund, BBC Capital, which he distinguished from BBC Equities, the latter of which he characterized as a real estate fund. He insisted that there is no better time to invest in real estate, and stated he was going after commercial and multifamily developments, anticipating $1.4 billion in new investment and $9 million annually in fee income. He also promised to pay money back to investors who wanted to "liquidate" their investments in BBC Equities. He mentions that investors always get their money and all their interest earned if they stay with BBC for at least a year. As for BBC Capital Fund, he states that he anticipates offering investments in three classes earning 12%, 10%, and 8% returns. He then asks for referrals.

As mentioned above, SEC Exhibit 1 is a compact disc containing three videos. One of them if a video recording of John Bravata making a "free lunch" presentation in January 2008. At the presentation, he makes reference to a promotional package, which he instructs the participants to study at home. He then compares the performance of mutual funds to real estate investments in "down years." Bravata explained that his two cardinal rules for investing are to protect principal dollars, and maximize return without jeopardizing principal dollars. He then stated that BBC Equities guarantees principal dollars that are invested into that fund, which are backed by certificates of deposit at the "Comerica Trust Company." He said his fund pays a "fixed guaranteed rate of 12%" paid quarterly. He said the fund's portfolio included no single-family homes, but there were vacation properties. He said there were no fees for investing and no penalty for withdrawing from the fund. He explained that the fund buys commercial real estate, paying ten to twenty percent and financing the balance; and all the properties leased had high rates of return. John Bravata represented that he was paid only from the profits of the company and only after the investors are paid their returns.

## II. Factual Findings

Based on the evidence presented, the Court finds that defendants John J. Bravata and Richard Trabulsy operated the corporate entities, BBC Equities, LLC and Bravata Financial Group, LLC. BBC Equities and Bravata Financial solicited contributions from individuals, representing that the funds would be invested and specific returns would be realized. Between May 22, 2006 and April 30, 2009 approximately 440 individual investors transferred to BBC Equities and Bravata Financial funds totaling $52,943,630. None of the defendants was a registered securities broker or dealer at the time.

The records of the corporate defendants reveal that the returns paid out to (or reinvested for) earlier investors came not from proceeds earned by the companies' investments, but rather from funds contributed by later investors. The records

also show that the investors' money was used by the defendant to purchase several personal luxury items.

## A. Inception Date

The Court concludes that the transfers by Roman Kuzma and Lily Trabulsy into the personal bank accounts of John and Shari Bravata and the account of Bravata Financial represent the initial investments in BBC Equities. BBC Equities's promotional materials represent that the "inception date" of the BBC Equities offering was May 1, 2006. John Bravata founded BBC Equities on that same date, although at the time BBC Equities was known as Bravata Holdings X, LLC. On May 19, 2006, John and Shari Bravata's primary bank account had a balance of $198.18. On May 22, 2006, Roman Kuzma wired $100,000 to the Bravatas' primary bank account, and he wired an additional $299,985 to the Bravatas' bank account on June 9, 2006. On June 8, 2006, Bravata Financial's bank account had a balance of $9,440.27. The next day, Lily Trabulsy (Richard Trabulsy's grandmother) paid $210,000, which was deposited into Bravata Financial's bank account. After receiving Lily Trabulsy's $210,000 deposit, Bravata Financial transferred $120,000 to John Bravata's primary checking account and issued Richard Trabulsy a $45,000 check with the notation "commissions."

John Barvata argues that investor Kuzma did not subscribe to the units offered and sold by BBC Equities in June 2006. Kuzma states that he entered into a partnership with John Bravata to purchase two distressed commercial properties in Brighton and Ferndale, Michigan for potential resale, and he loaned Bravata funds to establish a financial services business. However, Kuzma testified that he could not remember the specific dates of interactions with Bravata in the 2005–2007 time frame, and that he gave Bravata money during that period to invest in real estate.

In a settlement agreement that Kuzma entered with Bravata and BBC Equities in August 2008, Kuzma asserted that he was entitled to receive 3,000,000 Class A shares of BBC Equities securities as a result of Kuzma's advancing Bravata $890,000 for "real estate interests." Kuzma, Bravata, and BBC Equities agreed that "the funds [Kuzma] advanced were on account of his interests in [BBC–Equities–related] entities and not loans to Bravata." SEC Ex. 75, p. 1. Therefore, Kuzma's advances can be considered as nothing other than the initial investment in BBC Equities.

Bravata contends that he paid for the 1995 Ferrari from a $119,000 commission check that he earned during his employment at New York Life Insurance Company. He maintains that the check was deposited into his personal account on June 9, 2006. The record shows, however, that the Kuzma funds were wired to the account earlier, when the account balance was less than $200. Luz Aguilar testified that the New York Life commission check was in the amount of $60,000 and cleared the account on June 16, 2006. On June 13, 2006, Bravata wrote the Cauley Ferrari dealership a $5,000 check for a down payment on a $90,288 Ferrari sports car, and on June 16, 2006, Bravata issued an $85,268.40 cashier's check to Cauley Ferrari to complete the purchase of his Ferrari. Without the money he received from Kuzma and Lily Trabulsy, Bravata did not have enough money to purchase the Ferrari. Kuzma testified that he was unaware that Bravata purchased the Ferrari using Kuzma's money.

## B. Fraudulent Nature of the Investment Scheme

The defendants maintain that they made several disclosures to prospective investors that countermanded some of the statements made at the presentation seminars. In fact, the first private placement memo-

randum disclosed the possibility that new investors may help pay distributions to old investors. It stated that the Company has not derived sufficient income from its investments for quarterly distribution payments, and all quarterly payments of the preferred distribution had been paid from the proceeds received from other investors. It also disclosed that there was no guaranty that the "Preferred Distribution" or any redemption amounts would be paid when due. The PPM also stated that "given the early stage of the Company's development, the start-up and operating expenses incurred and other factors, the Company would have insufficient resources to fully redeem all currently outstanding Class C shares" in the case of liquidation. SEC Ex. 38, p. 25. The PPM continued to state that no assurances could be given that acquisitions of real estate or real-estate-related investments made with the proceeds of its offering would produce a return on investment or generate any operating cash flow, and that the Company would use investor funds from "this" offering to pay the Preferred Distributions or redemption amounts to the holders of interests until the Company showed a profit from its operations (which it never did).

However, the evidence also demonstrates that many of the early investors did not receive a PPM. At least 150 investors never received a PPM before investing. *See* SEC Ex. 39. BBC Equities did not distribute the first PPM until February 2007, and even then it was distributed only to certain prospective investors. From May 22, 2006 through February 6, 2007, a total of 15 BBC Equities investors wrote checks or sent wires totaling at least $3,274,073 to the defendants' bank accounts in exchange for Class A and C membership interests in BBC Equities securities. Before February 2007, John Bravata and Antonio Bravata gave presentations to prospective BBC Equities investors at "free lunch" seminars held in

restaurants, which likely is not the environment one would frequent when seeking "qualified investors." John Bravata told prospective investors his first rules of investing, noted above. He represented that those rules—maximizing return without imperiling principal—were the guiding philosophies of BBC Equities. He told prospective investors that BBC Equities secured their principal investments, which were guaranteed by certificates of deposit being held at Comerica Bank.

In fact, the value of BBC Equities's certificates of deposit never exceeded $413,000. Neither John nor Antonio Bravata told prospective investors before the PPM was constructed that BBC Equities's continued viability depended on a continuing flow of investor proceeds. John Bravata did tell the prospects that if BBC Equities's investors did not make money, then he did not make money. He explained that no manager at BBC Equities received a salary; they only got paid if BBC Equities made a profit. The evidence, however, shows that John Bravata did receive a salary and paid himself from investor proceeds regardless of whether BBC Equities earned a profit. The salary was paid through BBC Management, which in turn received payment from BBC Equities. Also before the PPM was constructed and distributed, John and Antonio Bravata both told prospective investors that BBC Equities guaranteed the returns on their investments and that BBC Equities offered 12% guaranteed returns.

Robert DeFauw, an Ann Arbor resident and executive at an automotive parts manufacturer, was one of the attendees at a presentation given by John Bravata at the Ritz Carlton in Dearborn in the summer of 2006. He testified that John Bravata told approximately 20 to 30 prospective investors that BBC Equities would use investor money to invest in real estate, and that as

"angel investors," these prospective investors' money would be protected and they could only lose their money if all subsequent investors lost their money first. John Bravata made representations to the group consistent with those described above.

James Deakin testified that he did not remember John Bravata making a sales pitch or guaranteeing investment returns at the Ritz Carlton presentation, and he says that he received a PPM in March 2007. He remembers a reference to "angel investors," but he construed that term differently than Mr. DeFauw. Mr. Deakin's lack of memory of representations described by Mr. DeFauw does not contradict DeFauw's testimony, nor does it establish that John Bravata did not make such representations. The absence of evidence is not evidence of absence. In addition, SEC Exhibit 1 shows John Bravata making representations similar to those described by Mr. DeFauw.

DeFauw met with John Bravata in BBC Equities's Brighton office in September 2006. At that meeting, Bravata told DeFauw that, in addition to guaranteeing DeFauw 10% annual interest payments, if Bravata did not double DeFauw's money, Bravata "wasn't doing his job." Evid. Hr'g Tr., Vol. II, Oct. 22, 2009 [dkt. # 136], at 114. DeFauw invested $50,000 in BBC Equities on September 22, 2006. He made his investment decision based solely on the representations he received from Bravata and did not see a BBC Equities PPM until one was shown to him by the SEC staff in mid–2009. The Court concludes that the PPM does not provide cover for the misrepresentations made by the defendants to prospective investors.

Moreover, the PPMs did not reflect the full story of how investor funds were applied. When the first PPM was used between February 2007 and April 2008, BBC Equities solicited and received approxi- mately $21.2 million from 136 investors. That PPM offered Class B membership interests in BBC Equities that were entitled to share pro rata with the holders of the Class A interests in profit distributions that would be declared by Bravata and Trabulsy; and Class C membership interests, which yielded annual dividends of 8%, 10%, or 12%, redeemable on December 31, 2007, December 31, 2009, and December 31, 2011, respectively. It capped offering expenses and organizational costs associated with the offering (which included commissions and finder's fees) at $800,000. A second PPM was used between April 2008 and June 30, 2009, during which the defendants raised approximately $30.6 million from 369 investors. The second PPM offered Class D membership interests in BBC Equities yielding 8% annual priority distributions. It represented that going forward John Bravata and Richard Trabulsy would receive no finder's fees for the investments they sold to BBC Equities's investors.

The Second PPM reported that Bravata and Trabulsy originally contributed eight properties to BBC Equities by BBC Equities and later acquired 28 additional real estate properties cumulatively valued at approximately $43 million, with only $34 million in mortgage debt. That suggests that about $9 million of the $21.2 million raised through the first PPM actually was directed toward the avowed purpose of the enterprise: investing in real estate. The second PPM was silent on that point. The Second PPM represented that as of February 28, 2008, BBC Equities had a net asset value of $11,294,718, with total assets of $46,670,615 and total liabilities of $35,375,897. In fact, however, BBC Equities's own outside auditor reported that as of December 31, 2007, BBC Equities had total assets of $40,603,738 and total liabilities of $46,453,032.

## C. Use of Funds

Of the $55 million raised from investors, BBC Equities spent approximately $20.7 million on real estate purchases to acquire 71 real estate investment properties. According to the Receiver, the majority of those properties are encumbered well beyond their reasonable value and presently are worthless. The records also indicate that BBC Equities paid out approximately $12.5 million to the earlier investors who did not elect a reinvestment option for their interest payments. As of June 30, 2009, BBC Equities paid BBC Management approximately $6,082,628; and it paid at least $2.1 million in purported commissions or "finder's fees" to BBC Equities' unregistered brokers for selling BBC Equities securities, including $386,521 to John Bravata and $216,045 to Richard Trabulsy. BBC Equities also entered into an agreement with Bravata Financial Group to fund its operating expenses, and through April 30, 2009 it had transferred $7,225,062 from its bank account to Bravata Financial's bank account.

Luz Aguilar testified that over the relevant period, John Bravata had outside income from sources other than the investment companies of approximately of $687,000 dollars, and Antonio Bravata earned at least $127,000 from his outside insurance sales. However, it appears that Bravata Financial earned less than $715,000 from selling life insurance.

The records indicate that from May 2006 through May 2009, BBC Equities transferred $821,632, BBC Management transferred $250,634, and Bravata Financial transferred $1,324,087 to John and Shari Bravata's primary personal bank account. The SEC has compiled a list of the items purchased by John and Shari Bravata and Antonio Bravata that includes luxury automobiles, jewelry, boats (along with Richard Trabulsy), trips, artwork, and construction of a lavish home in Brighton, Michigan.

The SEC also contends that a putative investment in vacation property located in Bonita Springs, Florida in fact never generated income and was used by the Bravatas as a personal vacation residence. The defendants contend the Florida home was used for charity events and business meetings and produced income, but the Court has not found convincing proof of that claim. The records also document the Bravatas lavish use of corporate credit cards for personal purchases. Melissa Traver testified that the business practice was for the card user to identify personal items, and a loan account would be established for those items. However, there is no evidence that the "loans" were repaid, and the purchases remained the obligation of the companies. Moreover, the amount of expenditures made by the Bravatas and Mr. Trabulsy during the period exceeded the amounts that they earned from outside income.

## D. Essential Failure of BBC Equities

Defendant John Bravata founded BBC Equities, he maintained, on two cardinal principles: first, protection of principal dollars; and second, maximizing returns without violating the first principle. It is fair to say that hundreds of investors found that philosophy attractive and entrusted Bravata with their money. But less than half of investors' money was used to purchase real estate—the main investment vehicle of BBC Equities as represented in presentations and the PPMs— and the real estate that was purchased was highly leveraged and risky. BBC Equities never was profitable, its operating expenses annually exceeded its revenue, and its net worth was increasingly negative in each of the three years of its existence. It is apparent that the only hope investors had of recovering their investments, not to mention realizing a return, was the re-

cruitment of fresh money from new investors.

It also appears that neither John Bravata nor BBC Equities were meeting their financial obligations. On July 8, 2009, the Internal Revenue Service levied on a life insurance policy owned by John Bravata and held by Minnesota Life because of Bravata's unpaid taxes in excess of $178,000. Also on July 8, 2009, the Huntington National Bank obtained a $4.18 million judgment against BBC Equities and Richard Trabulsy in the United States District Court for the Northern District of Ohio as a result of a defaulted promissory note relating to one of BBC Equities's investment properties. On July 16, 2009, the Huntington National Bank filed an action in a court in this District alleging that John Bravata also was liable as a guarantor on the same defaulted promissory note. Before the present lawsuit was filed, John Bravata had paid a retainer to bankruptcy counsel.

John Bravata did not deny that he promised investors that their prospective returns would be guaranteed by certificates of deposit in Comerica Bank or that he would not to take a salary unless BBC Equities did well. Instead, he invoked the Fifth Amendment as to those questions. He did testify that he did not tell prospective investors that BBC Equities depended on its continued receipt of cash from investors to operate, although that statement shows up in the PPMs, and Bravata is heard making that statement in a conference call to BBC Equities investors on June 18, 2009.

As disclosed by Defendants' Exhibit 143, on that conference call John Bravata said that the future of BBC Equities required "getting new investors into the company." He did not disclose to investors BBC Equities's ominous financial condition, instead asserting that "I am still very bullish on real estate." Def.s' Ex. 143. During that

call, Bravata announced that BBC Equities was starting a new venture capital fund called BBC Capital, which eventually became known as Phoenix Venture Capital, LLC. John Bravata began distributing a Phoenix PPM on July 16, 2009. That PPM describes Phoenix as a "holding company" which holds "interests in companies that are engaged in providing insurance products and financial services, construction management and business coaching and consulting." Ex. 64 at 6. Bravata was attempting to raise up to $200 million from the sale of "Class C shares" of Phoenix securities.

The PPM also makes reference to the possibility of acquiring an unnamed real estate subsidiary and a broker-dealer. Both Melissa Traver and James Bravata made reference to the later transaction during their testimony. However, no firsthand information was presented at the hearing, there was no documentation presented that might hint at the possibility of such a transaction, and the likelihood of BBC Equities having the wherewithal to consummate such transactions in the spring or summer of 2009 is extremely remote. Rather, the evidence points to the ineluctable conclusion that Phoenix Venture Capital was another effort by the defendants to perpetuate the investment pyramid by gathering more investors to support the promises made to earlier investors.

The Phoenix PPM suggests that the company may invest in industries including cable broadcasting, interactive media, oil and gas development, and pharmaceuticals. However, it also represents that Phoenix investor funds would be used to "retire[ ] existing debt encumbering real estate owned by our subsidiaries," but fails to disclose that BBC Equities is the subsidiary or that BBC Equities's debts exceeded $128 million. By mid-July 2009,

some BBC Equities investors had begun converting their BBC Equities securities to Phoenix shares. The SEC stepped in and filed its complaint in this case on July 26, 2009.

## III. Conclusions of Law

### A. Preliminary Injunction

■ A district court may enter a preliminary injunction in civil enforcement proceedings commenced by the SEC if "it determine[s] that defendants had violated and were likely to continue to violate securities laws unless enjoined." *SEC v. Prof'l Assocs.*, 731 F.2d 349, 353 (6th Cir.1984) (citing *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir.1975)). Those criteria does not track precisely the standard that applies in other injunctive proceedings. *See McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir.1997) (en banc) (describing the factors as "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction"). One Circuit adheres to the latter requirements, even in SEC enforcement proceedings. *See SEC v. Fife*, 311 F.3d 1, 8 (1st Cir.2002).

■ However, in *Management Dynamics, Inc.*, the court explained that SEC enforcement actions are not "governed by criteria identical to those which apply in private injunction suits." *Mgmt. Dynamics, Inc.*, 515 F.2d at 808. Rather, "[u]nlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are 'creatures of statute.' [Therefore], '[p]roof of irreparable injury or the inadequacy of other remedies as in the usual suit for injunction' is not required." *Ibid.* (quoting

III L. Loss, Securities Regulation 1979 (1961, Supp. 1969)). The court continued:

> And, as we said in *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102 (2d Cir.1972), "in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." But the statutory imprimatur given SEC enforcement proceedings is sufficient to obviate the need for a finding of irreparable injury at least where the statutory prerequisite the likelihood of future violation of the securities laws has been clearly demonstrated.

*Id.* at 808; *accord SEC v. Mize*, 615 F.2d 1046, 1051 (5th Cir.1980) ("The SEC is authorized to seek injunctive relief whenever it appears that a person is engaged in or 'about to engage in' acts or practices which constitute a violation of the federal securities laws. Section 20(b) of the Securities Act of 1933, 15 U.S.C. § 77t(b); section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d). The district court is required to grant the requested injunction 'upon a proper showing' by the SEC. *Id.* To satisfy the 'proper showing' requirement in a case where current violations are not alleged, the SEC must establish that there is a reasonable likelihood that the defendant, if not enjoined, will engage in future violations of the securities laws."); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1168 (D.C.Cir.1978) ("Where, as here, the SEC is not attempting to halt an ongoing violation, 'the ultimate test is whether the defendant's past conduct indicates ... that there is a reasonable likelihood of further violation(s) in the future.'") (quoting *SEC v. Commonwealth Chemical Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir.1978)).

Although the Sixth Circuit has not specifically subscribed to that view, it has

indicated its approval of the concept. *See EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037, 1041 n. 4 (6th Cir.1981) (holding that § 706(f)(2) of Title VII of the Civil Rights Act of 1964 did not create its own standard for granting of preliminary injunctions, and noting that "[t]he language of 706(f)(2) is in contrast with a number of other federal statutes authorizing government agencies to seek injunctive relief, which do appear to limit the district court's discretion as to whether the injunction should issue. *See, e.g.*, 7 U.S.C. § 13a–1; 15 U.S.C. § 78u(d) ('upon a proper showing (of a violation of the statute or a regulation), a permanent or temporary injunction shall be issued' ....')"). Moreover, the Supreme Court in *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), seems to support that view as well. In that case, the Court held:

> Sections 20(b) and 21(d) provide that the Commission may seek injunctive relief whenever it appears that a person "is engaged or [is] about to engage in any acts or practices" constituting a violation of the 1933 or 1934 Acts or regulations promulgated thereunder and that, "upon a proper showing," a district court shall grant the injunction. *The elements of "a proper showing" thus include, at a minimum, proof that a person is engaged in or is about to engage in a substantive violation of either one of the Acts or of the regulations promulgated thereunder.* Accordingly, when scienter is an element of the substantive violation sought to be enjoined, it must be proved before an injunction may issue. But with respect to those provisions such as § 17(a)(2) and § 17(a)(3), which may be violated even in the absence of scienter, nothing on the face of § 20(b) or § 21(d) purports to impose an independent requirement of scienter. And there is nothing in the legislative history of either provision to suggest a contrary legislative intent.

This is not to say, however, that scienter has no bearing at all on whether a district court should enjoin a person violating or about to violate § 17(a)(2) or § 17(a)(3). *In cases where the Commission is seeking to enjoin a person "about to engage in any acts or practices which ... will constitute" a violation of those provisions, the Commission must establish a sufficient evidentiary predicate to show that such future violation may occur.* See SEC v. Commonwealth Chemical Sec., Inc., 574 F.2d 90, 98–100 (2d Cir. 1978) (Friendly, J.); 3 L. Loss, Securities Regulation at 1976. An important factor in this regard is the degree of intentional wrongdoing evident in a defendant's past conduct. *See SEC v. Wills*, 472 F.Supp. 1250, 1273–1275 (D.D.C.1978). Moreover, as the Commission recognizes, a district court may consider scienter or lack of it as one of the aggravating or mitigating factors to be taken into account in exercising its equitable discretion in deciding whether or not to grant injunctive relief. And the proper exercise of equitable discretion is necessary to ensure a "nice adjustment and reconciliation between the public interest and private needs." *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944).

*Id.* at 700–01, 100 S.Ct. 1945 (emphasis added).

■ In the context of an SEC enforcement action, therefore, courts have interpreted the test to require the demonstration of both a *prima facie* case of past violations and a reasonable likelihood or propensity to engage in future violations. *See SEC v. Unifund SAL*, 910 F.2d 1028, 1037 (2d Cir.1990); *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir.1998). Some additional factors a district court may consider

in deciding whether an injunction is proper are (1) the likelihood of future violations; (2) the degree of *scienter* involved; (3) the sincerity of the defendant's assurances against future violations; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition of the wrongful nature of his conduct; and (6) the likelihood, because of the defendant's professional occupation, that future violations might occur. *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976). Quite naturally, the defendant's past behavior is relevant to show that he may violate the securities laws in the future. *Prof'l Assocs.*, 731 F.2d at 357–58 (citing *SEC v. Washington Cnty. Util. Dist.*, 676 F.2d 218, 227 (6th Cir.1982)). And "[a]s the frequency and magnitude of the past violations increase, the strength of the inference also increases." *Washington County Utility District*, 676 F.2d at 227.

### 1. Merits

The SEC has alleged that the defendants violated the securities laws in three respects: the anti-fraud provisions of the federal securities laws; the registration requirements for the securities; and the registration requirements for broker-dealers. The evidence in this case demonstrates a likelihood that the SEC will prove violations in each of these areas in a trial on the merits. There is, therefore, a substantial likelihood of success on the merits.

#### a. Anti–Fraud Laws

Federal law provides:

It shall be unlawful for any person in the offer or sale of any securities or any security-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). It is also unlawful

[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm–Leach–Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

 "To establish violations of these anti-fraud provisions, the SEC must show that the defendants engaged in (1) misrepresentations or omissions of material facts (2) made in connection with the offer, sale or purchase of securities (3) with scienter on the part of the defendants." *SEC v. George*, 426 F.3d 786, 792 (6th Cir.2005) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). A fact is "material" if a "reasonable shareholder" would consider it important in making an investment decision or "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc.*

*v. Levinson,* 485 U.S. 224, 231–232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

■ First, as noted above, the defendants told the initial investors that their investments would be used to purchase real estate, the investments would be secured by certificates of deposit, the returns of 12% were guaranteed, and neither John nor Antonio Bravata would be paid unless the investors were paid first. It is true that *some* of the money went toward the purchase or real estate, but the rest of these statements were false. As to the use of the money, information that less than half of the investments would be used to buy real estate, with the balance going toward administrative expenses (which included the lavish personal items enjoyed by the individual defendants), would have altered the "total mix" of data any reasonable investor would want to know before making a decision to invest in BBC Equities. In both the first and second PPMs, the defendants failed to depict the true financial condition of the company, particularly the inevitability that the only way investors would see a return or recovery of principal was if new investors paid money into the company. There was no disclosure of the true manner in which the funds were used, and certainly no representation that less than half the money invested actually went to the acquisition of assets. There can be little doubt that if the complete story were told, any reasonable investor would have had a different picture of the company, which likely would have altered his or her investment decision. Therefore, the evidence has established misrepresentations that were material.

Second, there is little question that the various classes of membership interests in BBC Equities the defendants sold to investors were "securities" within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934, which include "investment contract[s]" among the definition of "security." 15 U.S.C. § 77b(a)(1). An investment contract is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. Edwards,* 540 U.S. 389, 393, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004) (quoting *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)).

■ Third, the *scienter* that must be shown is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst,* 425 U.S. at 193 n. 12, 96 S.Ct. 1375. Certainly, the actual intent to deceive satisfies this requirement. In addition, "for statements of present or historical fact, the state of mind required is recklessness." *Miller v. Champion Enters. Inc.,* 346 F.3d 660, 672 (6th Cir.2003). Recklessness amounts to "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. Although the danger need not be actually known, it must at least be so obvious that any reasonable man would have known of it." *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1025 (6th Cir.1979).

The intent to deceive and defraud is well demonstrated by the record in this case. From the outset, the individual defendants handled the money entrusted to them in a manner that was antipodal to their professed creed of protecting principal investment and eschewing compensation until they made good on their pledge to investors. Their professed philosophy was "I don't get paid until you get paid," but in practice their approach was "Eat dessert first." They used the initial influx of cash to make purchases of luxury items for themselves, and their use of funds on behalf of investors was to purchase highly

leveraged properties that proved to be of little worth. It was plain, as John Bravata acknowledged, that the future of the business depended on persuading more people to invest. He was in the process of obtaining money from other people by way of his Phoenix Venture Capital offering—which itself failed to paint a true picture of the shaky foundations of the BBC companies—when the lawsuit was filed. The evidence shows an initial and continuing actual intent to defraud. The plaintiff has offered substantial evidence of the requisite *scienter*.

The Court finds that the SEC has offered substantial proof of violations of the anti-fraud statutes and regulations.

b. Securities Registration Provisions

 Under the Securities Act of 1933, it is unlawful for any person to sell or offer or attempt to sell any security "[u]nless a registration statement is in effect as to [such] security." 15 U.S.C. § 77e(a); *see also* 15 U.S.C. § 77e(c) ("It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security. . . ."). The "essential purpose" of this legislation is "to protect investors by requiring publication of certain information concerning securities before [they are] offered for sale." *A.C Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38, 40, 61 S.Ct. 414, 85 L.Ed. 500 (1941). The SEC establishes *a prima facie* violation of these sections when it shows that (1) no registration was in effect as to a given security; (2) the defendant offered or sold the security; and (3) the offer or sale was accomplished through interstate commerce. *SEC v. Cont'l To-*

*bacco Co. of South Carolina,* 463 F.2d 137, 155 (5th Cir.1972).

 Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendants to establish that an exemption to the registration requirement applies. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953) ("Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable.") (quoting *Schlemmer v. Buffalo, Rochester & Pittsburgh Ry. Co.*, 205 U.S. 1, 10, 27 S.Ct. 407, 51 L.Ed. 681 (1907)).

The defendants do not argue that any exemption applies. Instead, they contend that "none of the Bravata Defendants should be found to have engaged in the regularity and scope of activities that compel a finding that they acted as unregistered broker dealers." Defs.' Proposed Findings at 63. That argument is untenable. A "broker," is defined as "any person engaged in the business of effecting transactions in securities for the accounts of others." 15 U.S.C. § 78c(a)(4)(A). The Sixth Circuit has identified several factors that point to a finding that a person fits this definition, which include "regular participation in securities transactions, employment with the issuer of the securities, payment by commission as opposed to salary, history of selling the securities of other issuers, involvement in advice to investors and active recruitment of investors." *George*, 426 F.3d at 797. Of these factors, the only one not supported by the evidence is that the individual defendants had a history of selling securities of issuers other than BBC Equities. The evidence in this case is clear: the defendants offered and sold BBC Equities securities to over 440 investors in various states using the Internet, the United States mails, and oth-

er forms of interstate commerce, and neither the securities nor the offerings were registered with the SEC.

### c. Broker Dealer Registration Requirements

In addition to registering the security or offering, a seller acting as a broker dealer must be registered with the SEC as well. *Id.* at 792 ("Section 15(a)(1) of the Exchange Act ... makes it 'unlawful for any broker or dealer ... to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security ... unless such broker or dealer is registered [with the Commission].'") (quoting 15 U.S.C. § 78*o* (a)(1)). There is no dispute that none of the defendants were so registered. It likewise is clear that both BBC Equities and Bravata Financial paid their employees and sales agents commissions or "finder's fees" of at least 8% for selling BBC Equities investments. The individual defendants (save Shari Bravata) were among those receiving these commissions, and they all solicited investors to purchase securities even though they were not registered with the SEC.

The Court finds from the evidence that the defendants violated the anti-fraud and registration provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934.

### 2. Other Factors

As noted above, other factors may come into play when injunctive relief is sought, such as irreparable harm, potential harm to others, and the public interest. However, section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), authorize the SEC to bring an action for a permanent or preliminary injunction and temporary restraining order enjoining conduct that violates the provisions of the Securities and Exchange Acts, respectively. Section 20(b) of the Securities Act reads:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, ... the Commission may, in its discretion, bring an action in any district court of the United States, or United States court of any Territory, *to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.*

15 U.S.C. § 77t(b) (emphasis added). Section 21(d) of the Exchange Act similarly reads:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder ..., it may in its discretion bring an action in the proper district court of the United States, the United States District Court for the District of Columbia, or the United States courts of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and *upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.*

15 U.S.C. § 78u(d)(1) (emphasis added).

The use of the word "shall" indicates Congress's clear preference for preliminary injunction relief where a credible allegation of a violation is made. *See EEOC v. Anchor Hocking Corp.,* 666 F.2d 1037, 1041 n. 4 (6th Cir.1981). In fact, "the SEC is entitled to a preliminary injunction when it establishes ... (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v.*

*Unique Fin. Concepts, Inc.,* 196 F.3d 1195, 1199 (11th Cir.1999) (citing *SEC v. Mgmt. Dynamics, Inc.,* 515 F.2d 801, 806–07 (2d Cir.1975); *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1100 (2d Cir.1972)). Although the SEC need not prove risk of irreparable injury or unavailability of remedies at law, "[l]ike any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks." *SEC v. Unifund SAL,* 910 F.2d 1028, 1035, 1039 (2d Cir.1990).

The Court finds that the plaintiff has done so here with respect to its request for an order enjoining further activity by the defendants and the need to freeze assets. There is strong evidence that the defendants were engaged in a scheme to solicit investments from members of the public, that they used false and misleading statements to achieve their goals, and they were about to embark on further fraudulent activity with a new offering. The balance of the relative harms favors the issuance of an injunction. And the public interest is served by an order that restrains the defendants from committing a public fraud.

### B. Receivership

The district court has the "broad powers and wide discretion" when "fashioning relief in an equity receivership proceeding." *SEC v. Basic Energy & Affiliated Res., Inc.,* 273 F.3d 657, 668 (6th Cir.2001) (quoting *SEC v. Elliott,* 953 F.2d 1560, 1566 (11th Cir.1992), *rev'd in part,* 998 F.2d 922 (11th Cir.1993)). Those powers include the remedy of disgorgement. *SEC v. Blavin,* 760 F.2d 706, 713 (6th Cir.1985) ("Once the Commission has established that a defendant has violated the securities laws, the district court possesses the equitable power to grant disgorgement...."). "The receiver's role, and the district court's purpose in the appoint-

ment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Liberte Capital Grp., LLC v. Capwill,* 462 F.3d 543, 551 (6th Cir.2006) (citing 13 *Moore's Federal Practice* ¶¶ 66.02–.03 (3d ed. 1999)).

The Receiver in this case has engaged in extensive efforts to identify and locate assets of the Receivership Entities, determine which, if any, of the assets have value, and take appropriate steps to preserve those assets. To the extent that assets can be traced to investor-derived funds, the Receiver has been empowered to take possession and preserve those as well. Based on the findings recited earlier, the Court concludes that the Receivership should continue and the Receiver's powers and authority should not be diminished.

### C. Asset Freeze

In general terms, courts should not issue a preliminary injunction freezing assets where no preexisting lien or equitable interest had been claimed. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 333, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999). However, the rule in *Grupo Mexicano* does not apply to equitable remedies employed to preserve the status quo in actions arising under the Securities Act, where the Commission seeks disgorgement of ill-gotten gains and not merely money damages. *See, e.g., United States ex rel. Rahman v. Oncology Assocs., P.C.,* 198 F.3d 489, 498 (4th Cir.1999); *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 735 (11th Cir.2005); *SEC v. Cavanagh,* 445 F.3d 105, 116–17 (2d Cir.2006); *Newby v. Enron Corp.,* 188 F.Supp.2d 684, 708–09 (S.D.Tex. 2002); *SEC v. Lauer,* 445 F.Supp.2d 1362, 1367 (S.D.Fla.2006); *cf. Charlesbank Equity Fund II v. Blinds to Go, Inc.,* 370 F.3d

151, 159 (1st Cir.2004) (assuming, without deciding, that the court had the authority to grant the relief requested).

In *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940), the Supreme Court authorized an injunction freezing assets to preserve the status quo in an action brought under the Securities Act where the SEC alleged that the defendants were guilty of fraudulent misrepresentations and concealment in the sale of securities purchased by the plaintiffs and requested rescission and restitution. The *Deckert* court recognized that the district court has authority to enter a preliminary injunction freezing assets and mandating the status quo "in aid of the recovery sought by [a] bill" to rescind a fraudulent sale and to obtain the restitution of the amounts paid. 311 U.S. at 289, 61 S.Ct. 229. "[W]hen the plaintiff creditor asserts a cognizable claim to specific assets of the defendant or seeks a remedy involving those assets, a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested." *Oncology Assocs.*, 198 F.3d at 496. Since disgorgement is an equitable remedy, *see United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 760 (6th Cir.1999), the asset-freeze provision contained in this Court's order is appropriate. Asset freeze orders are justified when the Court finds sufficient evidence of a threat that an individual will dissipate the assets. *Newby*, 188 F.Supp.2d at 707–08. That showing has been made.

The defendants have argued that certain specific assets should be unfrozen because they were not acquired with investor funds, including the bank accounts of Lily Trabulsy and Dylite Adams, certain automobiles—most notably a 1995 Ferrari purchased by John J. Bravata in June 2006—interests in insurance policies, and the balance of the retainer John Bravata paid to his bankruptcy counsel. "To persuade a court to unfreeze assets, the defendant must establish that the funds he seeks to release are untainted and that there are sufficient funds to satisfy any disgorgement remedy that might be ordered in the event a violation is established at trial." *SEC v. Stein*, No. 07 Civ. 3125, 2009 WL 1181061, at *1 (S.D.N.Y. Apr. 30, 2009) (Lynch, J.) (citing *SEC v. Roor*, No. 99 Civ. 3372, 1999 WL 553823, at *3 (S.D.N.Y. July 29, 1999)). The defendants plainly have not met that burden here. The records indicate that the bank accounts contain proceeds from BBC Equities distributions that derived from subsequent investors. The assets of John Bravata, including the Ferrari, also were acquired with tainted funds. The amount paid to bankruptcy counsel came from BBC Equities. Moreover, the defendants have failed to establish by any measure the proposition that they would be able to satisfy a disgorgement order if one is issued.

## IV. Conclusion

The Court finds that the plaintiff has demonstrated a substantial likelihood that it will succeed on the merits of its claims against the defendants, and other pertinent factors favor the continuation of the preliminary injunction, asset freeze order, and receivership now in place.

Accordingly, it is **ORDERED** that the plaintiff's motion for preliminary injunction [dkt. # 9] is **GRANTED.**

It is further **ORDERED** that the plaintiff's motion for order to show cause and preliminary injunction [dkt. # 90] is **DISMISSED as moot.**

It is further **ORDERED** that the Receiver's motion to compel John Bravata to turn over title to the 1995 Ferrari automobile and appear for examination to locate

and secure the asset [dkt. # 89] is **GRANTED.** Defendant John Bravata must turn over to the Receiver the title to the vehicle on or before the close of business on **February 7, 2011.** The Receiver may schedule an examination under oath of defendant John Bravata if necessary to locate the asset in due course.

It is further **ORDERED** that the Order for preliminary injunction and freezing assets [dkt. # 34] and the Order appointing the Receiver [dkt. # 54] are **CONTINUED** in full force and effect.